IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

HELEN PETERSON,                                    Case No. 3:22-cv-00465-JR

        Plaintiff,                                OPINION AND ORDER

     v.

CASCADIA SENIOR LIVING, LLC,
dba FIELDSTONE CORNELL LANDING

        Defendant.
_____

RUSSO, Magistrate Judge:

       Defendant Cascadia Senior Living, LLC (doing business as Fieldstone Cornell Landing)

("FCL") moves for summary judgment on plaintiff Helen Peterson's claims pursuant to Fed. R.

Civ. P. 56. All parties have consented to allow a Magistrate Judge enter final orders and judgement

in this case in accordance with Fed. R. Civ. P. 73 and 28 U.S.C. § 636(c). For the reasons set forth

below, FCL's motion is granted and this action is dismissed.

Page 1 – OPINION AND ORDER

# BACKGROUND[1]

This case hinges on whether plaintiff's state law rights were violated by FCL's termination.

## I.        Plaintiff's Disability

In the 1990s, plaintiff was diagnosed with Spondylolisthesis, a spinal disorder in which misaligned vertebra cause pain and other symptoms. Copple Decl. Ex. 1, at 9 (doc. 27).

## II.       Fieldstone Living Cornell

Plaintiff was recruited to FCL, a senior housing and memory care facility, and hired by Executive Director ("ED") Krista Kinzer in June 2018 to work as the Assistant Executive Director ("AED"). Kinzer Decl. ¶¶ 1-3 (doc. 26); Copple Decl. Ex. 1, at 4-5, 37 (doc. 27); Liss Decl. Ex. 2, at 7 (doc. 30-2). As AED, plaintiff played an administrative role, and was responsible for supervising FCL's departments and generally assisting the ED with managing daily operations. The AED is also expected "to step in if there's a need on the floor in memory care." Liss Decl. Ex. 2, at 60, 79 (doc. 30-2). Plaintiff therefore reported directly to Kinzer and was the "second in command." Liss Decl. Ex. 1, at 25 (doc. 30-1). She worked a rotating schedule, approximately five days per week, eight hours per day (although occasionally she worked longer hours). *Id.* at 35.

Prior to FCL, plaintiff had worked with Kinzer at a different care facility and felt that she was a fair supervisor. Copple Decl. Ex. 1, at 2-3, 6 (doc. 27); Liss Decl. Ex. 1, at 11 (doc. 30-1); Liss Decl. Ex. 2, at 8 (doc. 30-2). Kinzer was aware of plaintiff's back impairment based on their pre-existing relationship and gave plaintiff the impression that her lifting restrictions would be accommodated at FCL. Liss Decl. Ex. 1, at 21-23, 43 (doc. 30-1).

---

[1] The Court cites to FCL's evidence except when referring to the non-duplicative information produced by plaintiff.

Kinzer was also responsible for hiring, among other employees, Andrea Brown, who worked as the Resident Care Coordinator ("RCC"). Kinzer Decl. ¶ 4 (doc. 26). Brown "was generally responsible for managing resident care, including overseeing the caregivers and medication technicians," and "reported to the Director of Nursing Services, Amy Sandoval who, in turn, reported to [plaintiff] and [Kinzer]."[2] *Id.*; Liss Decl. Ex. 5, at 9 (doc. 30-5). As RCC, Brown was regularly expected to fill in or cover shifts as a caregiver. Liss Decl. Ex. 2, at 79-80 (doc. 30-2). Like plaintiff, Brown had previously worked with Kinzer (along with Sandoval) at a different care facility. Liss Decl. Ex. 2, at 9 (doc. 30-2); Liss Decl. Ex. 4, at 8 (doc. 30-4); Liss Decl. Ex. 5, at 5 (doc. 30-5).

At all relevant times, FCL had a "Managers Handbook – Performance Improvement Process," which outlined progressive discipline for managers. Liss Decl. Ex. 2, at 13 (doc. 30-2); *see generally* Liss Decl. Ex. 44 (doc. 30-44). The steps were not mandatory and, even where the policy is followed, it was "[n]ot necessarily" documented. Liss Decl. Ex. 2, at 15, 33, 71-72 (doc. 30-2); Liss Decl. Ex. 35, at 13-15 (doc. 30-35); *see also* Liss Decl. Ex. 44, at 1 (doc. 30-44) ("Managers Handbook – Performance Improvement Process" specifying that FCL "**reserves the right to combine and skip steps depending on the circumstances of each situation and the nature of the offense [and] employees may be terminated without prior notice or disciplinary action**") (emphasis in original).

---

[2] Consistent with plaintiff's testimony, Brown remarked that she knew "very early on" that plaintiff had a disability that prevented her from "do[ing] heavy lifting," although plaintiff did not endorse any other restrictions or share the specifics of her impairment. Liss Decl. Ex. 4, at 18-19 (doc. 30-4); *see also* Liss Decl. Ex. 5, at 5 (doc. 30-5) (Sandoval testifying that plaintiff's back impairment and inability to "do lifting or strenuous activities" were common knowledge at FCL).

### III.    Relationship Between Plaintiff and Brown

Plaintiff and Brown both started working at FCL in their respective roles of AED and RCC in the spring of 2019. Copple Decl. Ex. 1, at 4-5, 37 (doc. 27). They initially had a positive relationship and, in September 2019, plaintiff received a favorable performance review.[3] Liss Decl. Ex. 4, at 11 (doc. 30-4); Liss Decl. Ex. 12 (doc. 30-12).

However, towards the end of 2019, problems started to emerge. On November 23, 2019, Brown emailed Kinzer about some tension with plaintiff:

> I haven't had a chance to talk with Helen. Hopefully our issues will resolve after our talk . . . For context, yesterday I came in on my day off to grab my charger. Per our conversation the community was a mess. I stayed to help with every situation, and continued to follow up from home. Today I came in on my day off for that meeting [and continued to work] until 4:30pm [due to] finding out I'm down two staff members in addition to the one we let go . . . At 4:30pm I decided to save what I had [regarding schedule changes], and email Helen to post it. I called about 10mins later to confirm in case she didn't see my email. I made it very clear that it is not complete, I will stay late tomorrow to do that, but I need it up so people know their schedules this week . . . Helen's response was that I didn't change the updated date in the corner, and now she will have to do that . . .
>
> Helen mentioned that the caregivers put [REDACTED] to bed after breakfast. She has not been up since for toileting, or meals, nurse was not called. I expressed my concern about this with a possible pneumonia situation. I don't expect [REDACTED] to be playing balloon ball, she should be getting up for the toilet, and meals. Helen immediately came at me with resident rights to stay in bed if that's what they want. I get that Krista, I really do. If a resident is too sick to go to the bathroom, or meals, the nurse should receive a call. That is a resident that needs to be seen in urgent care, or on hospice . . .
>
> I am so thrilled to be back, but you know some of the challenges I am facing. It feels really great to put in extra hours when I can see that it improves care for my residents, or I can see it's taken some pressure off the team that did so much to support me. It doesn't feel so great to work seven days a week, and have my AED complain that I missed something relatively minor, and continue to criticize my work when frankly my opinion perfectly aligns with how [Sandoval] wants care to look like. I will have the convo with Helen. Knowing that you have already talked

---

[3] Although plaintiff's September 2019 performance summary identifies "12/15/2019" as her next review date, the record does not contain any additional employee assessments. Liss Decl. Ex. 12 (doc. 30-12).

to her, we have two move outs, we have other families at risk, it's very frustrating for me to have these interactions with Helen. I anticipate that it will take more guidance on your end.

Kinzer Decl. Ex. A ([doc. 26](#)).

At some point thereafter, caregivers brought a concern to plaintiff about the assigned seating in the dining room. Copple Decl. Ex. 1, at 26 ([doc. 27](#)). Although plaintiff was not aware that Brown was in charge of and responsible for the seating chart, she did make a comment along the lines that "we can't force [the residents into particular seats] because that would be abuse. *Id.*; Liss Decl. Ex. 1, at 74-76 ([doc. 30-1](#)).

On November 25, 2019, Brown provided "feedback on the convo with" plaintiff to Kinzer:

The conversation was mostly positive . . . Helen did seem to really understand why she shouldn't have told the staff my instructions were abuse, and agreed to not do that again . . . I am glad you advocated for me, and empowered me to advocate for myself, but we can't have this happen to others as well. Helen expressed that because of the location of her office she is too removed to know what's going on. I totally get that, all of us face barriers to communication. I know the building layout sucks, but I think that besides just for me there needs to be a process in place for investigation before telling staff another manager is wrong, or guilty of abuse/neglect.

We talked about [other resident issues]. Helen [indicated] that we need to be compromising with staff. We are in the same book on that, but not even close to the same page. I can not ask staff to do things that are unreasonable . . . I will never be that RCC. That's why I come in at 6am to investigate late med passes, or stay until [the night shift] if need be. I want to show staff that we expect great care, and want workable solutions in place. I want feedback that notifies me that I need to observe, and make changes. I am happy to do this. The feedback I got during our meeting is that staff will do the wrong thing no matter what, so we should offer a less wrong alternative.

I am super uncomfortable with this. That sends them a message that they can keep eroding care standards, and that we are out of touch with reasonable expectations. I want to support staff when procedures are not reasonable, I need to be empowered to enforce reasonable expectations. If those are not consistent amongst managers it just allows staff to justify bad care by telling themselves I am not reasonable, or willing to compromise.

This next piece is very uncomfortable for me as I know I am straying out of my lane. Please feel free to correct me, while offering a solution. Helen needs more training on clinical issues. Today was very challenging. I was in the community from 6am-7pm. I still had so much to do that I hardly looked at my to do list, or the schedule which was my top priority. Right now I need to be on the floor correcting care staff . . . Helen honestly tried to be helpful [during that time but she] wasn't knowledgeable enough [to cover]. Over my last days off I have come into the community to find dire situations that should have been easily managed, but aren't because Helen hasn't been trained on them . . . I know Helen has a big heart. She was so kind during our talk today that I can't have any hard feelings, but she needs training. We can't be on the same page in the challenges we are facing if she doesn't understand care, med passes, hospice, etc. . .

Kinzer Decl. Ex. B ([doc. 26](doc. 26)).

On November 26, 2019, Brown requested some support in regard to an upcoming holiday task. Kinzer Decl. Ex. C ([doc. 26](doc. 26)). Kinzer replied that plaintiff would take over. *Id.* At that time, Brown also mentioned that plaintiff had allegedly revealed some sensitive information about her personal life to a staff member named David:

[T]hose conversations should not be happening . . . I can't afford a conflict with Helen right now. There have been times in the past that David has come to me with info/gossip that he got from Helen during their lunches together. Is there a way to let Helen know that although Davi[d] is a manager we should not be sharing info, especially specific info with him unless it's needed? I really don't think maintenance needs specific info about staff in other departments. Can we also educate David on an appropriate response when staff are complaining about other managers? I don't know how he is responding, but he just needs a script on that.

*Id.* Plaintiff denied "disclos[ing] any of [Brown's] personal details to David" and felt as though she was being falsely accused. Copple Decl. Ex. 1, at 30 ([doc. 27](doc. 27)). In contrast, Brown claims she "confronted Helen on it [and] she didn't deny that she did it." Liss Decl. Ex. 4, at 14 ([doc. 30-4](doc. 30-4)).

On November 29, 2019, Brown emailed Kinzer that:

Monique[4] noticed that Helen is regularly leaving me off of emails concerning care issues. I think Monique is largely unaware of the friction between Helen, and I. She was mostly expressing curiosity/concern as to why I am not included . . . I know I

---

[4] At all relevant times, Monique Lerno worked at FCL as the "RN assessment coordinator." Liss Decl. Ex. 6, at 4 ([doc. 30-6](doc. 30-6)).

> have some serious weaknesses [but] I don't think cutting me out of the items that
> are my direct responsibility is helpful . . . It is a really bad look for Fieldstone for
> me to inviting families to bring me concerns, assuring them I am giving special
> attention to their loved ones, and later be clueless about issues going on with them.

Kinzer Decl. Ex. D (doc. 26).

On December 5, 2019, plaintiff contacted Brown about the "steady decline" of a resident,

including that the resident was not eating or being as conversive, and had very low oxygen levels.

Kinzer Decl. Ex. E (doc. 26). Plaintiff closed her communication by thanking Brown "for letting

me know your perspective and what you are seeing with her" and expressing appreciation for

Brown and her "dedication to getting us back on track!" *Id.* Brown then forwarded the email to

Kinzer, stating:

> This is exactly the type of stuff I am struggling with. [REDACTED] is fully at
> baseline. Factually she does not usually converse with Helen because Helen avoids
> [the memory care unit] as much as possible . . . She has been in bed too much [due
> to] Helen directing staff to leave her there. [The family is] feeling pretty good about
> things right now. Hopefully we have not raised any alarms with them now. There
> is no way that [the resident's oxygen] was that low today without her being in acute
> distress. [Plaintiff's] response was condensing, and factually wrong in every way
> possible.
>
> Yesterday [REDACTED] had an injury fall with possible fracture [and] Helen had
> no idea what to do. She ended up putting an ice pack on and wrapped it in Curlex.
> Even a new [certified nursing assistant] knows that is a bad idea [and the resident's
> family] expressed concern over it. Helen is my boss so I can't just re-train on the
> spot. Instead I had to try to fake like maybe that's ok, and come back later to say
> that our [nurse] decided to go a different direction with that.
>
> Today (my day off) when I was packing up to leave Helen came and informed me
> that it was 12:15, staff are still getting people up, and "I don't know what to do[.]"
> I told Helen this is happening regularly and staff need, for now, reminders prior to
> meal service to start preparing. Helen replied she doesn't have time for that. I told
> her I will come do service with her in a moment. After joining her I noticed that
> walkers were still in the [dining room], residents not seated per chart, and
> [REDACTED] was given thin liquids.
>
> I asked Helen who poured [REDACTED] water. She was super awkward and said
> she didn't know. When [the caregivers] arrived I asked them. Both were standing
> next to Helen and cheerfully reported that Helen did it for them. Not a word of

denial from her. Helen regularly serves out the wrong diets whether it's thin liquids to [REDACTED] or gluten to [REDACTED]. [Sandoval] has addressed the thin liquids with Helen several times, has tried to educate her on aspiration, with no results . . .

While I was in today I had a 45min meeting with [REDACTED's] pissed off family. Earlier in the week they [saw a bandage on the resident's hand and] assumed there was an undocumented injury, which Helen confirmed for them . . . I explained to Helen that the dressing was different, and he didn't have a new injury [and] it's not appropriate for a high fall risk resident to have a box fan in the middle of the floor . . . David spoke with [the family] about a safe wall mounted fan [but] Helen indicated that things couldn't get done today in [the memory care unit] because it was "crazy." Factually it was a very normal day  . . . It's "crazy" when Helen is there because she is even less able to manage dementia than staff, but she is guiding them. It is literally smoother there if there is no manager, and staff are calling me, and Monique for guidance.

Per our previous conversation I am really having a hard time managing my resentment. I do not mind coming in seven days a week, or all the 12hr days. I owe you guys at least that. But, I am very frustrated wasting that effort when I am dealing with an AED that knows less than me, does not put in the extra hours, or work, and is constantly trying to put me in my place. The expectation of any good RCC is that we listen to our supervisor, and do all we can to provide excellent care to our residents. I am finding myself in a position where those two goals are distinctly in opposition to each other.

*Id.*

On January 13, 2020, Sandoval emailed Brown and Kinzer about a resident who was on "the shower schedule and on care stream for Tuesday and Saturday," but the family was unhappy because plaintiff told them "she would ensure [the resident] got showered Sunday." Kinzer Decl. Ex. F (doc. 26). Brown responded that short-staffing and other issues where going to make the showering schedule "rough," however, she did note: "Helen is making great progress, but managing the community on her own, and communication with families continues to be a weak area. I didn't hear anything from Helen about this. I worked the floor Sunday, and would have done it myself, or managed staff doing this." *Id.* Brown then went on to detail an incident where plaintiff informed a family that a resident's teeth had not been brushed because "oral care is not a

standard assistance we offer in" the memory care unit but "[t]his is very much standard for our [memory care] residents." *Id.* Brown requested that Sandoval and Kinzer "give [plaintiff] a script where she tells families we are sorry this happened, and will consult with the clinical team on why something happened, and what the solution is . . . I want to give Helen all the support in the world to continue making the great progress she is making. I totally recognize that she is one of the kindest humans I have ever known. I also don't want to keep having situations where families are told things that don't make sense, or are not followed through on." *Id.*

Sandoval replied: "I agree I see Helen improving, she is putting in a lot of effort and I know she means well. [The resident's] daughter, also came to me today confused because she said Helen told her [REDACTED] only gets showered once a week . . . I verified [that is resident] is scheduled for twice weekly showers. Krista, you just let me know how I can support Helen." *Id.*

Brown and plaintiff's relationship remained on a positive trajectory for a short period thereafter. Peterson Decl. Ex. A ([doc. 31-1](doc. 31-1)). At a certain point, however, a shift occurred and plaintiff felt that Brown "would be short or rude." Copple Decl. Ex. 1, at 16-17 ([doc. 27](doc. 27)).

On February 29, 2020, Brown emailed Kinzer with concerns about plaintiff:

> Helen, and I talked about this shower issue prior to her meeting with [Sandoval]. I gave Helen a list of reasons why [REDACTED] was missing showers, and my plans to address it which I started following through on that same day. During that conversation Helen said it would be a good idea to suggest cutting back to three showers a week as often the [family] think[s] a resident wants daily showers when really they don't. I asked Helen to please not suggest that, and instead allow me to fix the issues. [REDACTED] loves his daily showers. He is upset when he misses them. And, these showers, and meals are the only meaningful social interaction gets. He loves visiting with staff during his showers, and will happily get up from a dead sleep to shower. [Sandoval] absolutely agrees with every single thing I said. Not only is cutting back his showers bad for him, this [family is] extremely involved . . . Suggesting we cut back is not going to ever sound like we are looking after his best interest. Instead it's indirectly telling her that we are not able to provide the care he needs. It's insulting that the person that knows the least about our residents and has no connection with them disregarded everything I said without even the curtesy of explaining why, instead opting to let me know via this email.

Yesterday was complete chaos in the [dining room in light of brand new staff and resident altercations]. I was trying to pour drinks which I couldn't even do because I was having to stop and intervene with the residents trying to calm, and separate them. Helen came in to let me know she is leaving. It took her a minute to get my attention as it was that chaotic in there . . . I told her OK. She said "are you sure" indicating she could tell how crazy it was in there. I told her it's fine. I suppose I could have handled that better as clearly we both knew it wasn't fine. However, Helen is supposed to be my leader. When she saw what it was like in there she should have just jumped in to help rather than sheepishly acknowledging it, and saying she wants to go home. [Sandoval] and I are stuck there for dinner service every single night, no matter how early we come in, because it's a mess, and nobody else is willing to stay to help. It's very frustrating to keep hearing Helen pat herself on the back for her long hours, and hard work when I can set my clock by her walking out the door at 5pm no matter how out of control things are.

Yesterday I went to Helen to ask for help with the med carts [as there was an issue with unsafe medication passes.] Helen started squirming and saying she doesn't know anything about meds/med passes. I told her all I need from her was to find some Velcro for the 2nd cart so I can put a laptop on it. She happily agreed, but never did it, or followed up saying it wasn't done. [Plaintiff has been offered training many times but] is quick to say no. We are now a year in, and as soon as medications are even mentioned she looks fearful, and wants to end the conversation. I know we all have weak areas, but it's frustrating to have a leader, whom should be teaching/mentoring me, that can't even have a conversation about the job. I know it's just some stupid Velcro, but it's making the difference between having a safe med pass, or not. If Helen understood that maybe she would have at least let me know she didn't do it so I could try to figure something out . . .

I know I have had issues with Helen in the past. I have really been trying to work on my attitude towards her. Most of the time I manage my expectations about things like not helping with sticky situations. I know that it's your job to mentor Helen not mine, and I am confident you are doing that. It gets much harder to ignore when she starts making bad suggestions for residents that are completely counter to the input she is getting from the clinical team.

Kinzer Decl. Ex. G (doc. 26).

On March 4, 2020, Brown sent Kinzer a lengthy correspondence with additional concerns and examples of how plaintiff "is not being honest with families." Kinzer Decl. Ex. H (doc. 26).

Brown then stated:

On a more personal note I want you to know . . . every mistake, or possible mistake I make, I worry I will lose my career  . . .  Since my return [plaintiff] has made it very clear that she does not agree with, or support, any input I give. She has

supported staff in claiming I abuse residents, and has gone to family directly advising against advice/input I give . . . I understand pecking order, and that Helen is my supervisor. I'm sure she was chosen for that position for a reason. Right now I feel stuck in this really rough place between advocating for what I think is right, and a supervisor that has openly accused me of abuse, and continues to have a low opinion of me. I need to somehow get on the same page with Helen. If you want me to just go with her direction while you mentor her please say so. I just need some direction?

Kinzer Decl. Ex. H (doc. 26). Kinzer responded:

Thank you for the detailed info, I will add that into the conversation I have with [plaintiff.] I want to be sure you understand your direct supervisor is [Sandoval.] So if your concern is that Helen's opinion of you could result in you losing your job, I want to reassure you that is not the case . . . If you question or disagree with something Helen has instructed you to do or done, please approach this with her in an understanding professional approach & if you can't come to an agreement, then bring me in immediately. Helen has some growing she needs to do as well & this will help her learn the right way to approach a situation. Please keep me in the loop with issues & we will grow stronger as a team.

*Id.*

On March 10, 2020, Brown emailed Kinzer about a potential conflict between a resident and staff member. Kinzer Decl. Ex. I (doc. 26). "As an aside," Brown also sought to further discuss her relationship with plaintiff:

I am feeling completely burnt out. I have massive staff turnover, complaints, concerns, families upset, my inbox clearly informs me that home office is not happy with me, at times I am working 12hrs a day 7 days a week, call offs, I am being a terrible mother [but the thing that makes me feel the worst is [plaintiff's] degrading treatment . . . No matter how hard I work when Helen is there I end up being talked down to. That is normally complete with eye-rolling, hand waving, and is very public . . . There have been several topics (family concerns, and laundry labels) where Helen has let me know that "Krista" does not trust me to manage situations. Over the weekend I [walked in on plaintiff having lunch with another staff member, and] Helen looked at me, leaned into [the other staff member,] and started laughing, while still looking at me. It was so embarrassing . . . That 10 seconds of being laughed at did more to burn me out than any 70hr work week ever could . . . I don't know how to manage both the stress of this position, and degrading behavior from Helen . . . I don't think this is healthy for our community, or tenable for me as an RCC.

*Id.*

Page 11 – OPINION AND ORDER

On March 17, 2020, plaintiff and Brown met in an attempt to resolve some of the issues between them. Copple Decl. Ex. 1, at 19 (doc. 27). Each provided accounts of this interaction to Kinzer. Specifically, Brown reported:

> I know that Helen, and I, were both dishonest with each other today . . . I am starting to feel like I need to manage expectations with her as I do with staff, but also she is my supervisor so that complicates things. I hope that makes sense?
>
> When we spoke today Helen's take was that we have very different approaches. That is true. I agreed with that which is technically true, but didn't feel honest? It was also difficult to communicate honestly because Helen was being respectful [and] said that at times she feels I am upset with her, and she doesn't feel good about that. When Helen is being nice I can't bring myself to say anything that might be hurtful. Especially since I feel like when she is doing that it's under pressure from our ED.
>
> I ended up telling Helen that at times I feel very stressed by this job. As an example I told her work life is pretty awesome right now, but that I just returned from two (normal) days off. While I was gone two managers asked if I was ok because I haven't been coming to work. I had six staff ask why I was gone for so long . . . Helen's response is that she totally gets it. She reports that if she is gone for a single day she gets the same feedback, and that my supervisors have been doing everything they can to support me because you guys are worried I will quit.
>
> This is not honest communication. Helen's hours are none of my business, but I absolutely know that she takes more time off than any manager. It's insulting to have her tell me that people are hounding her if she takes a single day off . . . I am hoping that Helen saying my team is worried about me quitting is just Helen being Helen, but she is also my boss so I can't discount what she is saying to me. Please know that if you are concerned about my stress, or me leaving I welcome you to address that openly.

Liss Decl. Ex. 14 (doc. 30-11)

> In contrast, plaintiff reported:

> I followed up with [Brown] by saying I wanted to touch base with her about how things were going between us because I was still picking up on some tension and wanted to see what we could come up with to make things better. She made statements about how she liked me as a person and thought I was sweet so she's not sure why things still feel tense. I was clear that I respect her, her work, and want to have a good relationship with her. We are both coming from the same place, but have different styles of going about things, so we need to continue to communicate with each other and find ways to be on the same page to work as a cohesive team.

She talked about how stressful it's been and that she was trying not to burn out so sometimes things come out differently than she intends, but it's not personal. And it's getting better with [another staff manager] helping how — she got 2 days off!

I asked that we start calling it when things get tense in that moment when so we can start to identify what is going on and be able to make changes to improve our ability to work together. I also asked that we check in with each other more frequently to make sure that we are communicating and working well together.

I felt like it was a positive conversation and I'm hopeful that it helps ease whatever is causing the tension that seems to build between us.

Please let me know if you have any advice on how I can best deal with this situation to make things positive and be supportive to [Brown].

She did mention that she needs support for the staff to feel like they can take their lunch breaks, so I asked her to email when they take their breaks so I can be out there, visible, and helping in whatever way I can. So I plan to be out in [the memory care unit] more whenever possible.

Copple Decl. Ex. 1, at 38-39 (doc. 27). Kinzer responded to plaintiff:

I think that is a good start [and] the best way to move forward is to support her & her direction/decision with staff. If you see a situation that involves her staff, pull her in to it. If she makes a call or instructs staff to do something follow that lead & if we question what she has instructed we have a private conversation with her with all 3 of us. I know she feels burnt out sometimes working 16hr shifts & 7 days a week so the more we can support her & take on some of her responsibilities while she works to build & train our staff the better.

I'm confident this will resolve. Keep me in the loop with things & how it is going & I will let you know if I see or hear anything.

Also the break times are on the task sheet[.] Thank you for starting the conversation.

*Id.* at 39.

On March 22, 2020, Brown emailed Kinzer "to apologize for being such as ass about Helen today" as she "was actually being very nice." Kinzer Decl. Ex. J (doc. 26). Brown went on to state:

I think her intent was to be more present in [the memory care unit] and to really try to be helpful. It's not fair for me to want those things from her, and then be annoyed when she attempts to get more comfortable back there. I love that I am allowed to make mistakes. I should be extending that same grace to Helen. I need to take your advice of not thinking her as my boss so I can be comfortable communicating with

her more honestly. It can get really stressful when I am trying to cover a shift, which is a full job, and have staff, and providers that (understandably) expect me to still be wearing my RCC hat . . . Helen didn't do anything awful. She just kept hounding me about stupid crap like what size pants I want for [REDACTED] or making sure I refresh snacks for [the night] shift . . . I thought that I communicated to her that I was stressed by giving her a briefing of what I was trying to deal with. I think I maybe should have considered that to Helen that sounds like the norm. I should have been more clear, and added that the norm is actually super stressful when trying to be a caregiver at the same time. Instead I let myself feel like a bitch about it. My apologies.

*Id.* Kinzer responded by being supportive and encouraging Brown "to ask for help," concluding "you are on the path be being an even greater leader than you already are." *Id.*

Thereafter, Brown and plaintiff worked hard at communicating more effectively and, in April 2020, plaintiff offered to "take on monitoring onemint so we can be sure time sheets are ready to approve with payroll." Liss Decl. Ex. 11 ([doc. 30-11](#)); Peterson Decl. Ex. B ([doc. 31-2](#)). Brown expressed gratitude and provided instructions for this task. Peterson Decl. Ex. B ([doc. 31-2](#)). For approximately the following month, Brown and plaintiff appeared to be working well together while Brown put in "overtime on the floor." Peterson Decl. Exs. C-F ([doc. 31](#)); Liss Decl. Ex. 10 ([doc. 30-10](#)); *see also* Liss Decl. Ex. 23 ([doc. 30-23](#)) (Brown coming to Kinzer with a couple of issues related to plaintiff during April 2020 but otherwise acknowledging: "I actually think things are improving with my relationship with Helen. I just need a bit of guidance").

On May 16, 2020, Brown sent Kinzer a lengthy email requesting "help" with plaintiff:

Please know that I have taken your advice concerning Helen to heart, and have made great progress in managing my attitude towards her. I was super irritated with her yesterday. Today I recognize she did her best as we all did. I still feel that in several situations her weaknesses caused extra stress for all involved. I am sure my list of complaints will seem petty. In reality I am just trying to paint a complete picture. I also know that I could have done a better job in managing all of this. I am still struggling with knowing how to best step in when Helen is "in charge" of the community, but I can see she is making mistakes. I am including every little thing so that you can decide where Helen needs to be mentored. I also welcome feedback on what I should have done to reduce stress, and conflicts in the community.

[I overhear plaintiff and a staff member] having an uncomfortable conversation. [The staff member] was saying she needed . . . Helen to direct the family that was pulling up with furniture [for a new resident]. Helen was refusing[,] saying she has a bad back so can't be involved in moves [and] needs to watch the front desk. [The staff member] made it clear she didn't expect Helen to do lifting just direct & support. It was still a no . . . I stepped in directing [the staff member] to go pick up the new move in, asking Helen to watch the front desk . . .

Helen and I both arrived at 9:30am. I literally don't know, or care when other man[a]gers are expected to arrive. My time is not micromanaged, I assume it's the same for other managers. On Helen's screening she documented that she arrived at 9am . . . if Helen & I are telling staff they need to accurately document times we should be doing the same. It's uncomfortable hearing an AED constantly complain about working extra hours, and then seeing her fudge her time on a document all staff can see.

[A conflict arose surrounding allegations of potential resident abuse.] I tried to explain that [Sandoval] will always investigate alleged abuse, or injuries where she needs to rule out abuse, but that doesn't mean she was a witness. Helen indicated that is confusing, and she "has no way of knowing" these things . . . Helen does have a way of knowing these things. It's by asking the rest of her team . . . but [she] seemed to want to limit involvement.

[A staff member] came to my office saying that [a resident's family member] had a conversation with Helen that was upsetting to him [because] he was told that COVID was here to stay, and life will never be the same . . . he was told that it would take his mom months to settle in, that he won't see her face until she is dying, that we don't know what she is eating, or what approaches we are using to calm her, and that we can't work with families on solutions to connect them with loved ones . . . I felt obliged to offer some type of solution. My nurse ended up pissed that I did so without asking her, and she did not approve of the solutions I offered.

[Plaintiff then failed to make the bed of the new resident.] Bedtime is the busiest time for evening. More so with new residents. It sucks as an evening [caregiver] to come in, and find a stripped bed. It feels like the person that left it is rude. I know Helen doesn't get that, but she needs to.

[Later another staff member reported that] Helen had told her this is too much work, and it's not a manager's job to be moving furniture, or making beds. I am trying to shape [this staff member] into a manager that understands that this is an expectation for us. It may not be part of our daily routine, but it's still normal. I couldn't even guess how many times I have moved furniture with [Sandoval] over the years . . .

After 5pm . . . Helen popped in, and I asked her about payroll. There are still holes from last week, and nothing was approved. She gave me a long spiel on why she

won't follow up with staff/it's better to post a sign, and she hasn't been trained on timesheets . . .

[The new resident's] family called to say they went back to her old community to get . . . heavy furniture, TV, art, garbage bags full of both wet & dry clothes, etc. [The staff member] felt awful as I had just told her I was leaving. I ended up telling her that I can see she is having a hard time balancing this being her work, and the emotion of this being her granny, but at the end of the day this is a new move in so it's fine for me to stay late & deal with wacky family as I would for any new move in. Plus she is Fieldstone family so we are going to give her this support.

Helen talked about how she is so exhausted from already staying late (we got there at 9:30 neither of us were staying late at that point) but would make herself stay later to support the team, and would be sitting in your office if we needed any support.

During the second elevator load of furniture Helen stepped off the elevator that [we] were getting ready to load. She started wincing, holding her back and stating that she "finally had to give up" That this moving is just too much, and she needs to go home and get ice packs for her back.[5]

I very much appreciate the guidance you have given me regarding Helen, but I need more. I know I can call you & [Sandoval] for guidance at any time . . . I don't want to call with every little thing. I also don't want a series of little things to add up like this. I am very aware that I don't know the operations side of things. I assume Helen shines there, and is bringing much to the table. I also can plainly see she doesn't know this other stuff. I can see she is trying hard, but is insecure. Rather than saying she doesn't know something/asking questions of her team, she guesses at things which adds more work for the rest of us.

Liss Decl. Ex. 7 (doc. 30-7).

On May 18, 2020, Brown emailed Kinzer about the new resident, including that Lerno was

upset with her and the family had made a complaint about plaintiff "not giving specifics [and]

assurance[s]." Liss Decl. Ex. 17 (doc. 30-17). Brown concluded her email by stating: "I have great

---

[5] Brown explained at her deposition: "Helen wasn't physically doing the moving part, which was fine, so it seemed odd to me that she was then saying that it was too strenuous. She was just supervising us. She did wipe down a couple of things, but mostly she was just verbally supervising, so I was a little confused as to what that was a strain to her back." Liss Decl. Ex. 4, at 37 (doc. 30-1).

support in you, and [Sandoval], and I am still failing . . . Other than you & [Sandoval] I don't feel

like anyone is happy with my work, including me." *Id.*

Kinzer responded the following day by acknowledging how stressful things had been,

providing a number of positive reassurances, and explaining: "I know it can be mentally draining

& cause you to feel as though you are failing when all the people around you are upset & pointing

that at you. Don't look at is if you are failing . . . People know you have the experience, knowledge,

& ability to handle any type of crisis or issue so it gets aimed at you especially when [Sandoval]

& I are not here." Liss Decl. Ex. 22 (doc. 30-22). Kinzer concluded her email by reiterating Brown

was not a failure and thanking her. *Id.*

Brown sent a responsive email as follows:

Honestly none of the things that happened Friday were things I haven't dealt with
100 times . . . what left me feeling like a failure here was seeing Helen make bad
choices, and holding back on taking over until it was on the brink of disaster. In
light of our conversation I think what I should have done was call you early in the
day[.] That would have allowed me to interve[ne] in situations earlier before they
became issues to resolve later. It would have also left me feeling more confident in
my choices (which I do think were good ones), and focusing on supporting people
without taking time to second guess[.]

I worry about my relationship with Helen now, and in the future. When I met Helen
at the leasing office I told [Sandoval] Helen was the new manager I was most
excited to work with. I know I didn't start off with a bias here, or at worst it was a
good one. I had thought Helen was the kind of down to earth AED that I could build
a relationship with, and would be willing to mentor me. After starting when you, or
[Sandoval], asked Helen to do something she would come ask me to do it, and then
hand it in as her work. That still made me happy because I pictured us as a balanced
team. I promise I started off with very positive feelings about her.

Once I came back from leave it was obviously ugly. I've had supervisors that were
not so great, but never one that told staff I abuse residents. I don't know if Helen
thought I was really awful, or if my complaints about care just made her job so
much harder. I do know she was mean, and I felt scrutinized.

I don't know what conversations you two have had, but there has been a huge shift.
Helen is never mean to me. Instead I feel like I make her feel intimidated, and

insecure. For my day to day work that is way less stressful than Helen being a dick to me, but it's still not healthy for the community, or what best serves our residents.

I also need to give thought to the future. I love that you are a great buffer for Helen. Given the fact that you are an amazing ED, and Fieldstone is a growing community, I need to be mindful that at some point you will get promoted out . . . My hope, and expectation, is that when Helen is promoted to ED that I will be promoted to AED. I don't want to find myself [a position where I need to] start over elsewhere because I know I can't work under the leadership offered . . . Please advise?

*Id.*

On May 30, 2020, Brown came to Kinzer with more complaints about plaintiff, her interactions with staff, and lack of knowledge. Liss Decl. Ex. 21 (doc. 30-21). Brown concluded her email by stating: "Today I spent a ton of time trying to man[a]ge a situation that my AED wasn't able to manage, but also says I can't be trusted to train on . . . I don't want to be an ass, but per the usual weekend routine if you & [Sandoval] are not there both Helen and Monique had to be out by 4pm while also spending the day telling me I need to 'figure it out.'" *Id.*

On June 16, 2020, Brown contacted Kinzer with additional complaints about plaintiff:

I'm sure you are fed up to your eyeballs with me bitching about Helen. I promise you I am equally tired of listening to myself complain. I know Helen is a super nice person, she just makes bad choices because she doesn't have the clinical experience to make good ones. I feel for that, but I also think she needs to step up, and get that experience which would totally be offered to her at Fieldstone.

The day that [REDACTED] was having all of those falls Monique decided to send her out on evening shift. There wasn't a bad injury. It was Monique concerned with the underlining reason for so many falls in one day. I was working the floor as [a caregiver. An] EMT [was called after which I] discovered the issue with the printer . . . [the EMT was] upset that they were waiting on paperwork. At that time I offered to print the [necessary paperwork] and was told Helen was doing it . . . [After some time] Helen stepped out into the common area saying she had it ready. She was completely ready to go home. She had her bags packed, cat in carrier, all of her stuff ready, office locked up. She got herself, and cat ready to go while EMT was waiting on her so they could transport a resident to the [emergency room]. Are you fucking kidding me? I am glad that this wasn't a medical crisis, but factually Helen doesn't know enough to know if it was or not. Additionally it's important that we have a great relationship with first responders, and this is not a good look. Again I

know clinical training is outside Helen's comfort zone, but she needs to step outside that zone if she is going to be a leader.

As an aside, I am really happy Helen is sharing her cat with residents. The residents love the cat. However, she consistently decides to bring the cat out at 4:45pm when we are trying to hustle getting residents to dinner. She is stopping both residents, and staff to visit with & talk about the cat. It's disruptive. It delays both [us at] a very busy time [and] sets dinner back 15-20mins. 2pm-4pm are slower for [the memory care unit]. Can we do cat visits then instead of during the meal?

Liss Decl. Ex. 20 (doc. 30-20).

In late June 2020, Brown was dismissive and/or avoidant of plaintiff's attempts to communicate, and plaintiff was excluded from a staff birthday party. Copple Decl. Ex. 1, at 55 (doc. 27).

Around the same time, Brown again requested that Kinzer instruct plaintiff to limit pet therapy (which consisted of plaintiff bringing in her cat to visit with the residents) to an earlier time. Liss Decl. Ex. 19 (doc. 30-20). Kinzer agreed to do so and indicated further: "please feel free to communicate things like this directly to [plaintiff] if you are comfortable doing so. I am working with her on those things . . . If you are not comfortable going to her, that is ok, I don't want to put either of you in an uncomfortable position[.]" *Id.* Brown then elucidated:

I know it probably seems like I hate Helen. I actually don't. I think Helen is a really nice person. I just get very frustrated for a variety of reasons, one of them being that she functions very differently when you are in the building vs not. My knee jerk reaction is to feel like that's purposeful, but I could be totally wrong. She maybe just feels her role is different when you aren't there just as my job feels very different when you & [Sandoval] are not there . . . As for my communication with Helen I'd like a minute to reflect on that with your input. Recently I have focused my communication with Helen on topics where we can agree, or I am asking her for assistance/support that is positive, and she feels successful . . . I'm not sure if it's best to continue focusing on positive communication, and letting you manage difficult conversations. Or, if it's better to have a more well rounded dialog that doesn't leave Helen feeling like I am nice when talking to her, but make complaints behind her back. Thoughts?

*Id.*

Page 19 – OPINION AND ORDER

On July 3, 2020, Brown emailed Kinzer about plaintiff, this time with good news:

No stresses this time boss lady. I just want you to be aware in case it comes up.

[REDACTED] had a window visit scheduled [which] ended up [being] an outside visit instead . . . Helen whom in typical Helen fashion was ready to go out and end that. She seemed pretty fierce. Per your previous advice I stepped in, and mentioned to Helen that I know it's not keeping with policy, but frankly . . . I think we should just enforce the distance thing while letting them know we are doing them a solid looking the other way, and it's not really allowed. I might have made a different call with a different manger, and family . . . I did [check in to make sure the family member] was fully complying with [the distance requirement] as well as wearing her mask even outside 6ft away.

Helen was agreeable to my suggestion of just advising them on being safe. Pretty impressive since I know that is outside her comfort zone. I just wanted you up to date since even though this went well I know it's far enough outside Helen's comfort zone that she may feel a need to tell you. I could also be 100% wrong on that as Helen, surprisingly, actually seemed happy to have me direct that? She also responded by very sweetly advising [the staff member] not give a cigarette [to this family member] if she is heading downstairs for a window visit. Very helpful, solution oriented advise from Helen.

Liss Decl. Ex. 8 (doc. 30-7). Kinzer thanked Brown for "step[ping] in," indicating "the situation was handled appropriately & Helen responded well to that!" *Id.*

On July 7, 2020, plaintiff drafted an email to Kinzer expressing hesitance about "disciplining the care staff for time sheet issues [Brown] typically manages," as she worried this "is going to create conflict between me and [Brown] and I've worked really hard to improve our relationship as much as possible." Copple Decl. Ex. 1, at 40-41 (doc. 27); Liss Decl. Ex. 1, at 51-52 (doc. 30-1). It is unclear whether this email was ever sent.

On July 21, 2020, an employee named Kirsten quit mid-shift while plaintiff was on site. Copple Decl. Ex. 1, at 21 (doc. 27). Plaintiff texted both Brown and Kinzer as follows at 2:38 p.m.:

Plaintiff: Kirsten just clocked out and told me she will not be back.

Brown: Did you have a conversations with her or direct her to talk with anyone?

Plaintiff: I spoke with her and she decided in not continuing her employment past today.

Kinzer: That's it?

Brown: Helen, what did this conversation look like? I need more details. What did you do to try to retain her? Who did you direct her to speak with? I am on the floor [full time] and am having to have [Sandoval] and [Kinzer] cover shifts. I am not opposed to letting people go if it benefits residents, but if that's not the case I need to retain people whenever possible. I need to try to retain Kirsten. I need more details on what that convo looked like. Kirsten has threatened to quit several time. Normally that means she is stressed, and needs support. We need to have an honest conversation about what support was offered. Kirsten is extremely insecure. If her quitted was accepted with attempts to retain her she will see that as us wanting her to leave. I will also say I know she has had a rough (for her) week, and is upset with me. Bottom line is I need details from this conversation & who she was directed for further conversation.

*Id.* at 42-45.

At 3:00 p.m., plaintiff sent an email exclusively to Kinzer providing additional details about Kirsten's departure:

I asked Kirsten to call you regarding her reasons for leaving with no notice so you can hear it from her. She claims [Brown] is creating a hostile work environment.

I don't know what's accurate and not, so this is simply what she reported to me and I have not verified any of it. She said she has only called in twice in the year and a half she's worked here, and was sent home sick once, but is being told she has excessive call outs. She feels that she was accused of being an alcoholic in a phone conversation yesterday and is offended as, even if that were true, that would be her personal life and not her supervisor's concern as she always comes to work and has never worked while intoxicated.

She says she has text messages from [Brown] that are rude and condescending and feels that she isn't able to tolerate being treated daily like that by her supervisor anymore. It is impacting her mental health and she dreads coming to work everyday because of how she will be treated. She hinted that several other care staff are almost at their limit for the same reasons and are looking for other jobs . . .

Kinzer Decl. Ex. K (doc. 26); Copple Decl. Ex. 1, at 55 (doc. 27). Around this time, plaintiff was aware of other employee complaints surrounding Brown's allegedly "rude" and/or disrespectful behavior, and had also had additional conversations with Kinzer surrounding how to repair her

relationship with Brown. Copple Decl. Ex. 1, at 21, 23 (doc. 27). According to plaintiff, Kinzer did not validate her concerns but did "explain how [Brown] was not dealing with failing at her job, and that was impacting how [Brown] was responding." *Id.* at 23.

> At 5:58 p.m., plaintiff resumed her text exchange with Brown and Kinzer:
>
> Plaintiff: Just got out of my Dr. appointment. She had a lot of complaints that I attempted to address. I did my best to save her, as she is a good [medication technician]. I know she needs validation and positive praise but all she would say was, "thank you but I'm done. I just can't anymore." She repeatedly stated that she was done and would not be back. I directed her several times to call [Kinzer].
>
> Brown: Helen, I hope all is well, and things went well at your doctors appointment. I am sorry to bother you when you are sick. When you are feeling well can you reach out with specific details? Hearing that she had complaints doesn't help me address those complaints for her, or future staff. I need details regarding her complaints. Please feel free to give those details to [Kinzer] if that is easiest.

Copple Decl. Ex. 1, at 46-48 (doc. 27). Plaintiff thereafter texted Kinzer, characterizing Brown's messages as "attacking" and requesting "support as this just isn't healthy for either of us." Liss Decl. Ex. 1, at 68-71 (doc. 30-1); Liss Decl. Ex. 18, at 1 (doc. 30-18). Kinzer responded:

> I need you to be the bigger person and be professional and focus on work please. I can't fix this between you two from this far away. Please[.] If [Brown] is there working the floor please just do not interact with her and let her work. I can't afford to have her walk out right now and I can't fix this issue not being there.

Liss Decl. Ex. 1, at 71-73 (doc. 30-1); Liss Decl. Ex. 18, at 2 (doc. 30-18). Plaintiff replied: "I understand and am sorry to bother you . . . since she is in the [memory care unit] tonight, I will not help with dinner then." Liss Decl. Ex. 18, at 3 (doc. 30-18). Plaintiff understood that Kinzer "was going to follow up with [Brown] in regards to Kirsten," but there is no indication that Kinzer communicated to Brown that plaintiff had relayed the relevant information privately to her. Liss Decl. Ex. 1, at 73 (doc. 30-1).

On July 22, 2022, plaintiff fielded a complaint from a resident's daughter about Brown – specifically, a dispute arose surrounding the resident's nightgowns, and the daughter "didn't

appreciate that [Brown] thinks she knows better than her what her mom likes or needs." *Id.* at 55. Plaintiff felt that, after she had resolved the issue, Brown intervened in an "attempt to undermine my authority and cast doubt on my ability to manage the simplest of issues by going directly to the family." *Id.* at 56.

Later that day, Brown followed-up with plaintiff about the events that transpired with Kirsten. She included Kinzer on this email:

> I am concerned with your management of Kirsten yesterday, and the way you are treating me in general . . . When a staff member leaves without notice it has an enormous impact on my life, and my son's life. Typically it means that I am turning my whole schedule upside down, coming in on short notice for odd hours, working many extra hours under a stressful situation, etc. Besides that when I am covering shifts for someone that left without notice my day doesn't end with that shift. After working their eight hours I need to do my RCC work. Today [on] my "day off" I was up at 4am getting ready for work. After 2pm I was working on the schedule, and doing interviews until after 5pm. When someone leaves without notice it can easily nearly double the hours I have to work in a week.

> I worry about having someone manage over that process that is not invested, and does not feel like that process is important. I know you don't feel that this was important because you reported it with a brief one line text with no details, and even when I asked, multiple times for details they were not given. When I saw you today you didn't follow up answering the questions I asked (twice) yesterday. I would guess that if a situation happened at the community that was going to double your hours you would expect a verbal conversation, and details. I would certainly do that for any staff working under me. It's troubling that you didn't consider doing that for me. I am sure your intentions were not to be dismissive, or disrespectful, but the actions were.

> After not getting the requested details from you I turned to my nurses [and learned] that David "joked" with Kirsten about calling off [due to] drinking (this convinced Kirsten I was gossiping about her) . . . This is the second time I have been in this position. [After] I was on leave David [let] me know that you told him I was having issues with my ex . . . It's very uncomfortable to set boundaries with him, have you violate those, and then have to try to set them again. I would request that if David is asking questions about me, or my reports, that you refer him to [Kinzer].

> This issue with David brings me back to when I returned from leave . . . The well meaning advice you gave [to staff] lead them to reporting to [Kinzer] and myself that I was instructing them to abuse residents. I know Kirsten came to you with complaints about me. I have had my ups and downs with Kirsten, and it's been an

intense month with her. I now worry that you may have validated her complaints against me (as has happened in the past) instead of explaining policy to her . . . While I know you don't have bad intentions I need you to honestly know that if it weren't for the way [Sandoval and Kinzer] have respected me previously yesterday would have been my last straw. I would have given notice today over the way that you have treated me.

I know that RCCs are expected to be flexible. I don't expect an AED to be flexible in the same way. I understand that an AED isn't expected to work over 40hrs a week while an RCC is.

I am still a person, and a mother as well. I don't think it's reasonable to accept that you can make time for your cat, but it's expected that my son isn't afforded that same care.

Going forward I would ask that if something happens at the community that is going to greatly increase my workload that either [Kinzer] or I get a phone call as the situation is unfolding, and that I be either provided with details, or that [Kinzer] tells me I can't have those details. The way this happened was demoralizing. I am happy to talk with you about this, but I absolutely reject being treated this way going forward.

*Id.* at 53-54.

Plaintiff perceived this email as "false accusations and personal attack[s] [and] discriminate[on] against my disability." *Id.* at 56. She met with Kinzer to discuss Brown's email and was "advised not to respond to the false accusations and personal attacks [and instead] respond by acknowledging, and understanding, and offering to help." *Id.*

On July 23, 2020, plaintiff replied, again including Kinzer (who had pre-approved the email):

I apologize that my actions came across this way. It was definitely not the intent. I was actually making decisions to help protect the work relationship between you and me.

I fully recognize the significant sacrifices you, and your family, make on behalf of Fieldstone frequently, if not daily. And the impact that any staff member leaving has on not only the staffing schedule, but what that means to your personal schedule, in addition to [Sandoval] and [Kinzer]. I have been in that position for extended periods myself and understand the sacrifices you are currently making. I am happy to help support clinical however I can when these situations arise.

> In regards to Kirsten, I chose to follow up immediately with [Kinzer] given the nature of the complaints and the difficulties you and I have had in our professional relationship. In my professional judgement, I was not the best person to address the complaints with you. I made sure you had the immediate information you needed that she had resigned her position as soon as possible, knowing that information was urgent, and followed up with my supervisor regarding the reasons why. When you continued to question my decision to not discuss specifics at that time, I reached out for guidance and was advised not to respond at that time. It was not an attempt to be dismissive. I understand that you prefer to be the one managing issues regarding the staff you supervisor, and I always refer them back to you with issues whenever possible. In this situation, I was not able to do that and managed the situation as respectfully as possible for all parties involved.
>
> Going forward, I will continue to make efforts to improve our relationship and be a support to the clinical team, especially during times when extra help is needed covering shifts. My disability prevents me from transferring residents but it does not mean that I don't understand or appreciate the impact staffing challenges have on the entire team. I'm hopeful that we can come together to find a professional, respectful way to continue working together.

*Id.* at 51-52.

During her shift that day with Sandoval and Brown, plaintiff discerned "hostility [that] was palpable from both of them." *Id.* at 56. They had interactions relating to the schedule of a new hire, Marina, with Kinzer ultimately stepping in to take over. *Id.* Brown resigned shortly thereafter. *Id.*; Liss Decl. Ex. 4, at 44 (doc. 30-4). From that point forward, plaintiff believed that Kinzer was unwilling to address Brown's performance issues "because they need her to cover shifts on the floor." Liss Decl. Ex. 1, at 67-68 (doc. 30-1).

On July 24, Brown emailed Kinzer:

> I haven't read this email from Helen, and likely won't. I am sure whatever it says sounds very nice . . . it's not . . . She did not speak a single word to me [yesterday after refusing to respond to my text messages or email]. Literally not even a hello as we passed each other in the hallway. I was furious. So much so that I demanded that [Sandoval] go down to Helen's office, or send you, and tell Helen she needs to apologize. I was told that's not possible because Helen doesn't like me so she is not going to apologize . . .
>
> After I was [at work yesterday] for a couple of hours Helen came and found me in the med room. I was actively popping pills/completing a med pass. She very matter

of factly told me that the new hire was done with training, needed a schedule, and is waiting on me. I told Helen I am sorry, but I am med teching today so I won't be able to do that. She looked really surprised, and was like "what" I reiterated that I was [a medication technician], not RCC. That I can't do both jobs, and going forward when I am covering the floor I can't also RCC. She looked even more surprised, and asked so what do you expect us to do. I told her well I guess when I am on the floor you will do the RCC work. Then she looked mortified, gave me another "what" So, I told her that [I don't know], yeah I guess that while I am on the floor she will have to do extra work.

She ended up passing the task to [Sandoval], and went straight to her office to finally reply to my attempts to communicate.

So to recap this I spent several days trying to communicate with Helen. She did not respond, or say a single word to me. Literally within moments of discovering her poor treatment of me might result in extra work for her she responded. Whatever this email pretends to say it is not a nice email. What this email actually says is that Helen wants permission to continue this cycle where she treats me poorly, causes me extra work & stress while she takes it easy, backs off when it has some type of consequence for her, repeat. And, in between I let people sell me on the idea that Helen is a nice person that just doesn't know any better. That she just isn't very smart. People that are not very smart can also be mean. Helen is mean . . . the longer I tolerate that the worse the outcome is for me. When you read Helen's nice email please know that it came after I spent days trying to communicate with her with not a single word, but moments after me telling her that she will have to put in some extra work. This is not a nice email from her.

Liss Decl. Ex. 33 (doc. 30-33). Kinzer answered Brown:

Do know it is never acceptable for someone to treat another coworker poorly & with ill intent no matter their position or if they are "unintelligent" or "nice." As you know dealing with personnel issues is not an immediate resolution and there is a process as to handling them [but this] last situation was handled extremely poorly & I have & will continue to address it partnering with HR.

As we did not get the opportunity to speak in person after receiving your notice, I wanted to reach out sooner than later & not allow for any avoidance of this situation . . . I understand there has been no balance in your life & the stress of your position coupled with the personnel issues occurring has tipped your patience over the edge. For that I take full blame [and] to you I extend the biggest apology & regret that I have completely failed you . . . I hope for our industry that it is still to become an ED! I have not given up on helping you towards that goal.

Kinzer Decl. Ex. L (doc. 26).

By July 26, 2020, Brown had apparently read plaintiff's email and replied:

Thank you for finally acknowledging my attempts to communicate with you. I will be honest, and tell you that this is not an apology at all. When you say that you apologize for your actions coming across a certain way what you are actually doing is putting the onus back on the harmed individual for how they perceived your actions without taking any responsibility for being part of the problem . . . Factually every single time you have managed a staff complaint about me the situation has escalated. Often to the point that staff have turned in written complaints of me abusing residents [due to] me asking them to follow a seating chart, or give showers. You are very much aware of this, and as such should not have attempted to manage this situation, which effects my workload, without consulting someone.

Factually every [caregiver or medication technician] in the building knows that when an issue arises that will require seeking coverage in the building that text is not accepted, a phone call is required. You know that as well, and chose to disregard it.

In your email you state that you are always willing to help. Factually the day this happened there were no offers to help. You didn't offer to help me. You didn't let [Sandoval], whom was on the floor, know what was going on, or offer to help. You waited until you were about to leave to even tell [Sandoval] whom could have directed you on ways to help as this was unfolding. Ignoring a situation until it is resolved, and then offering to help is not a sincere offer of help.

In this email you justify your poor treatment of me by [c]iting our challenging relationship as a reason this was too difficult to deal with. I reject this. All managers are expected to manage difficult conversations. I have difficult conversations with staff that I have bad relationships with all the time. We have a challenging relationship because of your consistent poor treatment of me. You are my AED. My leader. I don't accept that you are not expected to take on challenging situations, but I am. You are sending a very clear message that you expect more from the people that work under you than you do of yourself. That is not acceptable . . . Prioritizing your comfort over my workload, ignoring my complaints for days, stating via email that you are willing to help while at the same time not offering to help while you are in the building (in fact our only interactions have been you distracting me while I am working the floor to ask me to do RCC work) justifying treating me poorly because your prior poor treatment has made interactions uncomfortable, and most of all deflecting blame and not only not apologizing, but explaining to me why it's ok for me to be treated poorly are not professional, or normal.

My perception of this situation is perfectly acceptable, and more than reasonable. Me being upset, and turning in notice because my AED treats me poorly is to be expected. In fact most RCCs will not put up with it for as long as I did . . . What I hope you will take away from this is that you need to treat the next person better.

When the next RCC comes in you can't tell staff she abuses residents. You can't share her most person details with David/whole community, you can't expect her to work twice as hard as you without ever offering to help. When you encounter a crisis, that causes your next RCC to give up-her day off don't send her a flowery email saying your disability prevented you from helping. Your disability didn't prevent you from making a phone call, your disregard did . . .

Copple Decl. Ex. 1, at 50-51 (doc. 27). Following Brown's email, Kinzer reached out to plaintiff indicating that she had met with Brown and there were "definitely some hard feelings & concerns that need to be addressed professionally in the interest of our community and residents." Liss Decl. Ex. 36 (doc. 30-36). Kinzer suggested that she and plaintiff meet individually and then all three of them meet together. *Id.*

On July 30, 2020, three "new hires decided not to continue with [FLC]" during orientation. Kinzer Decl. Ex. M-N (doc. 26). Kinzer "assumed they quit due to the concern of COVID in the building" and attempted to follow up. Kinzer Decl. Ex. N (doc. 26). Plaintiff "only reported [the new hires leaving to Kinzer and another manager] who was also not in the community at the time." *Id.* Kinzer instructed plaintiff that "the appropriate managers to notify would have been [Sandoval and Brown,] and to communicate this to [them]." *Id.*

On August 2, 2020, Brown reached out to Kinzer to follow up about plaintiff:

Please know that if you want to address Helen for the sake of her growth opportunities you should. I don't expect, or want you to address it for my sake. Helen has made it perfectly clear that she is not willing to change her behavior. Frankly Helen doesn't care about the community, or anybody in it enough to modify her way of doing things. Our community is in crisis. Everyone is stressed, and working way too hard. Helen just keeps doing things to increase the workload of others, and every time her response is that she is doing a great job.

I arrived at work around 1:30pm the other day. I saw Helen several times. We didn't speak to each other. At 4:30pm Helen called me from the front desk. She told me that two new hires walked out of orientation. She didn't mention the third. She gave the reasons they left which are issues I addressed at hire so I am certain that's not why they left. She then said that she was the "only" manager working that day, so she called you & [another manager] at home for guidance [even though Sandoval] & I were both working that day . . . Helen reports that when she wasn't able to reach

either of you that she managed it on her own. She went on at length about what an amazing job she did though didn't give any specifics just several generic statements about how great she is. No mention of them not having working laptops, and her frustration at them not keeping up when they didn't have the tools to do so. No mention of five minute breaks. No opportunity for me to ask questions, or give feedback.

Helen then stated that you just called her back. She said "Krista said I had to call and notify you so that is why I am calling."

Obviously a very similar situation happened last week that was my final straw with Helen because of the disrespectful way it was managed. Helen was told that if she apologized (and changed her behavior) she could salvage me. I get it that Helen doesn't like me, and doesn't want me there. She knows that [Sandoval] does want me there. That I work a ton of hours to try to ease the burden for you, [Sandoval], and our overworked staff. Still not only did she refuse to apologize, but when a similar situation happened this week she tried to manage it in exactly the same way that she did last time. When you forced her to call me she gave a description of the steps she took to avoid notifying me, and made it very clear she was only telling me because you forced her. Helen does not care enough about our community, or anybody in it to change her behavior. 100% of the time that Helen manages a sticky situation with employees it results in someone quitting, and others working harder. Helen knows that, but it doesn't affect her workload so she doesn't care . . .

Three new hires got pissed off, and walked out. Helen's response was that she is doing a great job, and they are the issue. I would have walked if I were those women. Those were not 18yr old girls that don't know their value. They were grown, experienced women. They walked into a COVID+ building, for very little money, and they were shown from day one that our management intends to treat them like slaves. Would you do that for $15hr? Would Helen do that for $15hr? Nope none of us would. They had no way of knowing the rest of us would treat them differently. With the info they had they made a very good choice.

When I returned to Fieldstone [from leave] Helen had run [the memory care unit] into the dirt by passing her responsibilities off to staff. I went through months of stress, tears, and losing staff trying to convince Helen we can't do that. Our residents suffered, the community had move outs, staff were convinced I am awful, and abusive. Helen felt she was doing a great job, but eventually you forced her to stop. This week Helen [was] trying to go back to her old ways [by] passing [the management's workload] off to staff. [Sandoval rejected her efforts] and told Helen that staff don't run [the memory care unit], managers do. Helen is always going to prioritize herself over the wellbeing of our residents, and community . . .You can force Helen to call someone, but you can't force her to not be an asshole when she makes that call. With us all being overworked this is not a good use of our energy. I think the only thing that can be done here is for me to accept that Helen will spend the next 22 days being a jerk, and I need to decide to not be upset by it. It's a tough

pill to swallow. I might fail at it sometimes. I don't feel like Helen deserves her position in the community. I think my residents, and staff deserve an AED that will put them first.

I have nothing but contempt for Helen. She is the epitome of everything that is wrong with senior care. However, I love you, [Sandoval], and our community more than I hate Helen. To that end I will commit to trying to manage her poor treatment with as much grace as possible. I won't ask you to try to force her to treat me well. That doesn't produce results, and just stresses both of us. Not telling you how to do your job, but I think the most effective tactic would be to sit Helen down, and have a really honest conversation with her telling her that she won, that you know she hates me, that it's hard not to be an asshole to someone you hate, but that she doesn't need to do it for long.

Liss Decl. Ex. 27 (doc. 30-27).

On August 4, 2020, Kinzer heard back from two of the people who had walked out of orientation that plaintiff "was rude, unprofessional, and seemed to be irritated to be involved in their training." Kinzer Decl. ¶ 17 (doc. 26); Kinzer Decl. Ex. N (doc. 26).

On August 6, 2020, plaintiff met with Kinzer to discuss performance issues. Copple Decl. Ex. 1, at 32-33 (doc. 27). Plaintiff explained that she was not at fault for the loss of new employees. Peterson Decl. ¶ 11 (doc. 31). According to plaintiff, they were "playing on their phones when they should have been working on training tasks" and took "an 'additional' [prolonged] smoke break," and plaintiff "held them accountable in a professional manner." *Id.*; *see also* Liss Decl. Ex. 1, at 100 (doc. 30-1) (plaintiff testifying at her deposition that the new hires "were sitting there doing nothing, using the excuse [that] computers were dying instead of plugging them in" and "David . . . also had issues with them"). That same day, Kinzer "began drafting a performance plan for Ms. Peterson." Kinzer Decl. ¶ 18 (doc. 26); Kinzer Decl. Ex. O (doc. 26); Liss Decl. Ex. 2, at 28 (doc. 30-2).

On August 7, an employee named Shelly "left her shift last night without notifying anyone" due to vomiting. Kinzer Decl. Ex. P (doc. 26). At 9:32 a.m., plaintiff and Brown exchanged the following text messages:

> Brown: I texted [Kinzer] before realizing she is [off. The night shift] staff continue to leave mid shift without calling anyone. Shelly left last night at 2am leaving the community with only one experienced staff member . . . Obviously this needs to be addressed so that we don't lose new people. I am scheduled to cover shifts for the remainder of my notice, so won't be able to address this. Thanks in advance for managing this.
>
> Plaintiff: Thank you. I will follow up.

Liss Decl. Ex. 38 (doc. 30-38).

At 12:13 p.m., Brown emailed Kinzer about this event:

> [The night] shift is in crisis right now just like our whole community. Shelly's situation is delicate because she is going through personal issues. Still she has a pattern of doing this that predates those issues . . . Helen sent back a chipper one line about how she is going to manage this. What she should have done was had a brief 10min convo asking details about the history on [the night shift and staffing issues]. I know it would not have been comfortable for her, but it would have been best for everyone else . . .
>
> Today [Sandoval was] sick, miserable, and should have been at the doctor's. Instead she was working the floor, and managing staff to try to find coverage so that she could seek medical care. [Sandoval] should have been able to pass something off to Helen . . . Instead [Sandoval] took on the jobs of several people so that Helen could be comfortable in your office. Helen has not made the effort to become skilled, or knowledgeable, and is being rewarded by being exempt from the hard work, and sacrifice that the rest of us make daily.
>
> At the end of today [Sandoval] will walk out of there miserable, sick, and will still feel like that's not enough. At the end of the day I will walk out of there pissed off that I can't do enough to make things better for the people I love. Staff will walk out tonight exhausted, and wondering if they can do more. Helen will have a very easy day, and will walk out of there feeling like she is doing a great job. When I told [Sandoval] that I am pissed about this she said that Helen at least agreed to help with meals, that's all she is capable of, so there is no point in being upset. I do not agree with this. Helen is capable of more. Helen is meeting expectations. Every

time Helen fails the expectation is lowered for her[6] . . . You left Helen in charge of the building today. She did a horrible job managing it. Others stepped up to correct her mistakes. Please know that doesn't mean Helen "swam" today. It means other people care enough to step up when Helen doesn't care.

Kinzer Decl. Ex. P ([doc. 26](doc. 26)).

At 1:56 p.m., plaintiff and Brown resumed their text exchange:

Brown: Thanks Helen. Honestly I am concerned. I hope that you are aware that [the night] shift is in crisis right now. Literally we are at risk of losing ever single person on [the night shift]. I know it's not comfortable for you to communicate with me, but I am worried that you are sending me a dismissive one liner saying you will manage this without getting any of the details/history that might help you retain staff, or manage this well. I understand being prideful. I really do. Over the last week three caregivers, and an RCC quite because of your management. I think we both need to set aside pride to do what's best for others. We need to move towards my exit. That means you need to step up & be comfortable working harder, putting in more hours. I need to be comfortable handing off my extra work to you. We need to have uncomfortable conversations surrounding this.

Plaintiff: I asked Monique this morning to call Shelley with me so there is a witness. If you have any information that you feel would be helpful in retaining Shelley, I would appreciate you passing that on to me at your earliest opportunity as we plan to call her shortly. As for uncomfortable conversations, we will need to have a witness present.

Brown: Ok, [Kinzer] agreed to me working two days a week going forward if you can't treat me well.[7]

Copple Decl. Ex. 1, at 65-68 ([doc. 27](doc. 27)).

---

[6] Brown clarified at her deposition that this comment was in reference to the fact that "I frequently encountered times that Helen said she was not trained to do something and she was giving me [or Sandoval] the work . . . after a very long time of her not getting trained on those things, it just felt like people stopped asking her to do them." Liss Decl. Ex. 4, at 42 ([doc. 30-4](doc. 30-4)). Brown commented further: "when my hours got overwhelming and I was having a hard time taking on that [caregiving work] it just became really frustrating" when plaintiff "would pass her work off to me" because she could have received training but declined. *Id.* at 12-13.

[7] Kinzer denied agreeing to this schedule and Brown did not recall Kinzer actually ever permitting her to work part-time due to plaintiff's alleged treatment. Liss Decl. Ex. 2, at 93 ([doc. 30-2](doc. 30-2)); Liss Decl. Ex. 4, at 71 ([doc. 30-4](doc. 30-4)).

At 4:17 p.m., plaintiff emailed Kinzer, Brown, Sandoval, and Lerno:

I was able to connect with Shelley regarding leaving her shift early at 2am. She explained that she had a procedure done earlier in the day and that she could make it through her shift but the pain became too severe and she was vomiting during the shift. She has a doctors note.

I asked her if she attempted to call any of the managers and she said she had texted [Brown] at 2am but didn't call. She said [Brown] texted back this morning with that she needs to call in the future and to feel better. I supported what [Brown] said and confirmed that calling and speaking to her supervisor is mandatory . . . Please let me know if her attendance record indicates that she needs a [performance improvement plan] for this or if there is any other information relevant to this issue that requires additional follow up.

Liss Decl. Ex. 16, at 6-7 (doc. 30-16); Liss Decl. Ex. 37 (doc. 30-37).

At 5:07 p.m., Brown replied to all as follows:

 I am sure we are all aware that Shelly (not Shelley) has walked off her shift with vomiting at least three times. Shelly also has a private situation that I am reluctant to share in a group email.

Factually I invited Helen to have a conversation with me about this today as I was concerned about someone managing this without background. At no time did Helen support me in any way. Instead she replied with a message stating that her and Monique were managing this, and that she needs a witness in order to speak with me. When I asked Monique about how they manage it [she] reported that she didn't know who Shelly was, and that nothing was done. It sounds like Helen moved forward with managing things without getting information because that is most comfortable for her . . . I think we both need to put aside our interest, and put the community first. In indicated this in my message to Helen today, but she was still very insistent that we put her needs first . . .

*Id.*

On August 8, 2020, FCL had "a call off for eve[ning] shift" while plaintiff was on site.

Copple Decl. Ex. 1, at 61 (doc. 27). Plaintiff notified Kinzer who instructed her to contact Brown.

*Id.* Brown "state[d] she is working the floor and will not be attempting to find any coverage." *Id.*

Plaintiff then worked with Kinzer, Sandoval, and Brown to come up with an acceptable plan, which

resulted in plaintiff working a couple of hours as a caregiver[8] until another staff member could arrive. *Id.*

While on the floor, plaintiff attempted to assist Marina in toileting a resident who was refusing care. *Id.* at 61-62. When "Marina report[ed] the refusal," Brown "state[d] that we HAVE to provide care and make sure a task is completed." *Id.* at 62. Unbeknownst to plaintiff, Marina reapproached the resident and was again refused. *Id.* Plaintiff learned of this at the same time as Brown, who then successfully assisted the resident in using the toilet. *Id.* Brown later stopped plaintiff to inform her "that we can't leave residents sitting in their filth and she had no problem getting [the resident] to agree to accept care." *Id.* Plaintiff agreed, but also emphasized the need to "honor . . . their right to refuse and follow . . . the approaches we teach to leave and reapproach later if they refuse (which is what [Brown did] but I was not given that chance)." *Id.*

Also on August 8th, plaintiff reached out to Kirsten Bault, the human resources manager. Copple Decl. Ex. 1, at 34 (doc. 27); Liss Decl. Ex. 1, at 31-32 (doc. 30-1); Liss Decl. Ex. 35, at 4 (doc. 30-35). Plaintiff "asked for direction on who to talk to or how to proceed with a concern regarding harassment," but did not provide specifics. Copple Decl. Ex. 1, at 35 (doc. 27); Peterson Decl. ¶ 10 (doc. 31); Liss Decl. Ex. 35, at 17-18, 20-22 (doc. 30-35). Bault responded to plaintiff's message with a generic voicemail. *Id.*

---

[8] Plaintiff was required to fill in as a caregiver on two occasions to satisfy legally mandated staffing quotas. Liss Decl. Ex. 1, at 39, 95 (doc. 30-1). As plaintiff's briefing acknowledges, her role as AED may require her to be on the floor. *See* Pl.'s Resp. to Mot. Summ. J. 4 (doc. 29) ("[i]n the event a caregiver shift needed to be covered, the first person to cover is the RCC, then it would be a nurse, and finally it would be the AED or the ED"). During plaintiff's first caregiving shift, Kinzer "attempted to accommodate me by giving me the 'easy people'" – i.e., those that were self-ambulatory. Liss Decl. Ex. 1, at 39, 41 (doc. 30-1). At some unspecified time after her first caregiver shift, plaintiff expressed concern to Kinzer about her lack of training as a caregiver and the fact that those tasks could cause pain. Peterson Decl. ¶ 3 (doc. 31); Liss Decl. Ex. 1, at 40-41 (doc. 30-1). In particular, while plaintiff did not tell Kinzer she could not "be a body on the floor," she avoided transferring or toileting residents, and otherwise did what she could to help. *Id.*

On August 9, 2020, Brown brought her frustrations about Marina and plaintiff to Kinzer:

At the beginning of the shift [Marina] informed me that Helen [in her role as caregiver] was refusing to help her change [a resident] because she has a disability, and doesn't do resident care. They were not getting [a resident] up. There was no lifting, or physical labor involved, [this resident] has great bed mobility and only requires instructions, and then physical assist with placing depends, cleaning, etc.[9]

After that Helen grabbed a tablet, and brought [REDACTED] to a table to watch something while Marina pulled up a seat at a nearby table. Both sat while Helen watched something with [REDACTED] until long after [REDACTED] fell asleep. Helen then moved on to sit near [REDACTED] and visit her.

Shortly after 3pm I asked Marina, with Helen standing behind her, whom had been toileted. Marina reported that every resident in the [memory care unit] was refusing care . . . I started to remind Marina about the process for refusals (have a [medication technician] approach, notify a clinical manager, etc.) She said she did notify a clinical manager, "ask Helen" and turned to Helen. Helen smiled and said yes all of the residents refused care . . . Marina then told me that she let Helen know that she was just going to wait until bedtime, and roll change residents in bed, and Helen was fine with that. Helen was standing there, and did not disagree. I told Marina that very few of our residents are roll change in bed, and that they can't go an entire shift without being toileted. I explained to Marina that I have work to do on the cart, that as soon as I am free I will come help, but please go approach residents again.

At [4 p.m.] I found Helen, and Marina in the [the memory care unit] kitchen pre-pouring drinks for the 5pm meal. Please know that . . . [t]here has not been one night where we needed two staff to pour drinks an hour before, let them sit out, and give residents whatever we want them to have. I would think on a shift where we didn't toilet anybody this would be even easier . . . I told them I would go see what I can do to provide care. Neither offered help. They went back to pouring juice.

Shortly after I bumped into Helen outside the laundry room. I had been in there washing [a resident's] clothes because she had soaked through them. When I cared for [this resident who had refused Marina and plaintiff] she was productive on the toilet in spite of being soaked through. She was not the least bit reluctant to care . . . When I saw Helen (Marina not present) I was not being a bitch. I know I often am, but I promise I wasn't angry, I was just defeated . . . I told her hey this can't happen. Marina is new to us. She can't be allowed to think it's acceptable to not

---

[9] Brown delineated at her deposition: "For safety reasons, because we don't allow side rails in memory care, we need somebody on each side of the bed to keep the resident oriented to where the side of the bed is . . . so that they don't scoot over so far that they fall off the bed." Liss Decl. Ex. 4, at 40 (doc. 30-4).

change residents for a whole shift, and just roll change them in bed at the end of the shift.

Helen responded by telling me that she has been telling Marina all shift to do her work, but can't force Marina to do it. She told me that this is her second day ever providing care for residents, and it's not fair for her to be expected to train new people. The conversation ended there. I promise you with everything in me that loves you, and our community that I humbled myself to Helen. I invited an honest conversation. She responded by placing the blame on me, and Marina . . . Please try to imagine for a moment that Helen is your boss. That is the frustration I am feeling.

Liss Decl. Ex. 43 (doc. 30-43).

## IV.    Plaintiff's Termination

On August 10, 2020, plaintiff woke up sick and did not go into work, as Kinzer was on site. Liss Decl. Ex. 1, at 62 (doc. 30-1); Liss Decl. Ex. 18, at 4-5 (doc. 30-18). That same day, Kinzer "converted the performance plan into a document memorializing Ms. Peterson's termination . . . because of additional performance issues with Ms. Peterson after August 6, 2020." Kinzer Decl. ¶ 18 (doc. 26); Kinzer Decl. Ex. O (doc. 26). In particular, on August 10, Marina sought guidance from Kinzer because she received conflicting instructions from Brown and plaintiff, and Kinzer determined Marina "was given incorrect info [from plaintiff] on how to approach residents in [the memory care unit] & how to ensure care is provided properly." Kinzer Decl. Ex. N (doc. 26). As a result of this and the other recent incidents, Kinzer lost "trust in the judgement, communication & decisions made by" plaintiff. *Id.*

Kinzer terminated plaintiff's employment on her next regularly scheduled workday – i.e., August 12, 2020. Copple Decl. Ex. 1, at 62-63 (doc. 27). During that conversation, plaintiff "express[ed] concern that I should not have been on the floor as a caregiver as I have never been trained or worked as a care giver, and providing care looks quite different on the floor than what we put in care plans." *Id.* at 62. Kinzer then recounted her conversation with Marina, noting her

"expectation for me, as the dementia expert, is to be able to instruct care staff on how to turn refusals into a yes, using the trainings and Teepa Snow approaches." *Id.* at 63. Plaintiff gave her side of the story but Kinzer then transitioned the conversation into concerns raised by staff and families that "they didn't have faith [plaintiff] could resolve their issue." *Id.*

Plaintiff felt that the damage to her work reputation was "intentionally and maliciously [caused by Brown] with the sole purpose of obtaining my termination," intimating that Brown was rewarded for her efforts by being "given a pay raise." *Id.*

Plaintiff subsequently returned Bault's call and left a voicemail indicating that the situation "had escalated to where I had been terminated." Copple Decl. Ex. 1, at 35-36 (doc. 27). Bault did not return that phone call. Peterson Decl. ¶ 12 (doc. 31). She did, however, complete paperwork following plaintiff's termination denoting that the reason for the discharge was the failure to follow FCL policy. Liss Decl. Ex. 35, at 23-26 (doc. 30-35); Liss Decl. Ex. 47 (doc. 30-47).

A few weeks after plaintiff was terminated, Brown took over as AED. Liss Decl. Ex. 2, at 43 (doc. 30-2); Liss Decl. Ex. 4, at 26-27 (doc. 30-4). She resigned from that position in late 2021 after Kinzer left FCL and the new ED placed her on two performance improvement plans. Liss Decl. Ex. 2, at 4 (doc. 30-2); Liss Decl. Ex. 4, at 6-7 (doc. 30-4); Liss Decl. Ex. 35, at 12 (doc. 30-35).

## V.    Proceedings Before this Court

On December 31, 2021, plaintiff initiated this action in Multnomah County Circuit Court, alleging claims for: (1) disability discrimination/perceived disability discrimination under Or. Rev. Stat. § 659A.112; and (2) whistleblower retaliation under Or. Rev. Stat. § 659A.199. FCL thereafter timely removed plaintiff's complaint to this Court. On March 24, 2023, FCL filed the

present motion for summary judgment. Briefing was completed in regard to that motion on April 28, 2023.

## STANDARD OF REVIEW

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, affidavits, and admissions on file, if any, show "that there is no genuine dispute as to any material fact and the [moving party] is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(a)*. Substantive law on an issue determines the materiality of a fact. *T.W. Elec. Servs., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). Whether the evidence is such that a reasonable jury could return a verdict for the nonmoving party determines the authenticity of the dispute. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The moving party has the burden of establishing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party shows the absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings and identify facts which show a genuine issue for trial. *Id.* at 324.

Special rules of construction apply when evaluating a summary judgment motion: (1) all reasonable doubts as to the existence of genuine issues of material fact should be resolved against the moving party; and (2) all inferences to be drawn from the underlying facts must be viewed in the light most favorable to the nonmoving party. *T.W. Elec.*, 809 F.2d at 630.

## DISCUSSION

FCL asserts summary judgment is warranted because plaintiff's claims fail as a matter of law since "there is no direct evidence of discrimination [or retaliation]," and plaintiff "cannot establish a prima facie case." Def.'s Mot. Summ. J. 17-18 (doc. 25). Alternatively, FCL argues that, assuming a prima facie case exists, summary judgment is appropriate because legitimate, non-

discriminatory reasons existed for the decision to terminate plaintiff and there is no evidence of pretext.

Where, as here, there is no direct evidence of discrimination, claims under Or. Rev. Stat. § 659A.199 and Or. Rev. Stat. § 659A.199 are governed by the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).[10] *Mayo v. PCC Structurals, Inc.*, 795 F.3d 941, 943 (9th Cir. 2015). Pursuant to this framework, the plaintiff must first establish a prima facie case. *Id.* If the plaintiff proves a prima facie case, the burden of production shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse employment action. *Id.* If the defendant articulates such a rationale, the plaintiff bears the ultimate burden of demonstrating that the reason was merely a pretext for a discriminatory or retaliatory motive. *Id.* at 944.

---

[10] As both parties acknowledge, "[t]he standard for establishing a prima facie case of discrimination under Oregon law is identical to that used in federal law." *Snead v. Metro. Prop. & Cas. Ins. Co.*, 237 F.3d 1080, 1087 (9th Cir. 2001); *see also* Or. Rev. Stat. § 659A.139(1) (Oregon's disability statutes "shall be construed to the extent possible in a manner that is consistent with any similar provisions of the federal Americans with Disabilities Act" ("ADA")). While plaintiff predominately phrases her opposition within the *McDonnell Douglas* framework, she does argue in the alternative that there is direct evidence of discrimination (but not retaliation) based on the unspecified emails and text messages of Brown and Kinzer. Pl.'s Resp. to Mot. Summ. J. 41-46 (doc. 29). As detailed herein, much of the alleged evidence of discrimination plaintiff points to is not born out by the actual record before the Court. Likewise, the portions of the record on which plaintiff relies cannot be fairly characterized as "evidence which, if believed, proves the fact [of disability-based discriminatory animus] without inference or presumption." *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1221 (9th Cir. 1998) (citation and internal quotations omitted); *see also Nidds v. Schindler Elevator Corp.*, 113 F.3d 912, 918-19 (9th Cir. 1996) (stray remarks and ambivalent statements about an employee's protected status, even by a decision-maker, are inadequate to permit an inference of discriminatory animus); *France v. Johnson*, 795 F.3d 1170, 1173-77 (9th Cir. 2015) (in an age discrimination case, a supervisor's "repeated retirement discussions" with the plaintiff, "despite [his] clear indications that he did not want to retire," as well as a suggestion from the supervisor that, "if he were in [the plaintiff's] position, he would retire as soon as possible," did not constitute direct evidence of discrimination).

## II.    Disability Discrimination Claim

Claims under Or. Rev. Stat. § 659A.112 require the plaintiff to initially show: "(1) she is disabled; (2) she is qualified; and (3) suffered an adverse employment action because of her disability." *Magee v. Trader Joe's Co.*, 2020 WL 9550008, *7 (D. Or. Sept. 1, 2020), *adopted in relevant part by* 2021 WL 1550336 (D. Or. Apr. 20, 2021) (citations omitted). FCL does not dispute the first two elements, or that plaintiff's termination qualifies as an adverse employment action. As such, the sole issue surrounding plaintiff's prima facie case is whether there is evidence from which a jury could reasonably infer causation.

As a preliminary matter, plaintiff does not address the appropriate causation standard. That is, plaintiff cites to Ninth Circuit precedent articulating the prima facie case requirements for claims under Title VII, 42 U.S.C. § 1981, and the Age Discrimination in Employment Act (as opposed to the ADA or Or. Rev. Stat. § 659A.112) and argues that her "disability was a motivating factor in Cascadia's decision to terminate her employment." Pl.'s Resp. to Mot. Summ. J. 31-33 (doc. 29). However, the Ninth Circuit has clearly invalidated this method of proving causation for disability discrimination claims. *See Murray v. Mayo Clinic*, 934 F.3d 1101, 1105-07 (9th Cir. 2019) (overruling *Head v. Glacier Nw., Inc.*, 413 F.3d 1053 (9th Cir. 2005), to hold that ADA discrimination claims "must be evaluated under a but-for causation standard"); *see also Barrier v. City of the Dalles*, 2020 WL 9549996, *14 (D. Or. Dec. 21, 2020), *adopted by* 2021 WL 1265203 (D. Or. Apr. 6, 2021), *aff'd*, 2022 WL 832070 (9th Cir. Mar. 21, 2022) (ADA and Or. Rev. Stat. § 659A.112 claims both required a showing of "but for" causation); *Kannan v. Apple, Inc.*, 2022 WL 3973918, *1 (9th Cir. Aug. 31, 2022) (affirming summary judgment in favor of the employer on an ADA claim where the plaintiff "has not established the third prong of a prima facie case, which

requires that he establish that any adverse employment actions would not have occurred but for his disability") (citation internal quotations and brackets omitted).

Additionally, to the extent plaintiff attempts to establish that she was "treated less favorably than similarly situated nondisabled persons" – i.e., Brown – her argument is unavailing. Pl.'s Resp. to Mot. Summ. J. 36 (doc. 29). As plaintiff acknowledges, at the prima facie stage, this method of proof "requires only a minimal showing to establish that co-workers were similarly situated." *Id.* (quoting *Karthauser v. Columbia 9-1-1 Commc'ns Dist.*, 2022 WL 17979739, *6, -- F.Supp.2d -- (D. Or. Dec. 28, 2022)). Pursuant to precedent relied on by plaintiff, comparators must "have similar jobs and display similar conduct" to establish the fourth prima facie element for a claim under Title VII. *Karthauser*, 2022 WL 1797939 at *6; *see also Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 2002) (any purported comparators must "have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it").

Here, plaintiff relies on Kinzer's role as the ultimate supervisor, and the fact that plaintiff and Brown "supervised other employees [who] complained about [them or] walk[ed] off the job." Pl.'s Resp. to Mot. Summ. J. 37 (doc. 29). Concerning the first issue raised by plaintiff, whether two persons or groups of people report to the same supervisor is not necessarily dispositive. *Hawn v. Exec. Jet Mgmt., Inc.*, 615 F.3d 1151, 1158 (9th Cir. 2010). Regardless, the record evinces plaintiff and Brown held significantly different positions, such that Brown's direct supervisor was Sandoval (who reported to plaintiff and Kinzer), whereas plaintiff's direct supervisor was Kinzer. The fact that Kinzer, as the ED, was putatively in charge of every FCL employee is insufficient to demonstrate similarity in this context. *Cf. Jones v. Denver Post Corp.*, 203 F.3d 748, 753 (10th

Cir. 2000), *abrogated on other grounds by Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002) (an employee is not similarly situated to that employee's manager).

As to the second issue raised by plaintiff, there is no evidence that Brown's performance issues impacted the ability of new hires to do their jobs correctly. *See Hawn*, 615 F.3d at 1160-61 (affirming summary judgment in favor of the employer in a sex discrimination case because the plaintiff had not put forth adequate comparator evidence; although some "female employees seem to have engaged in questionable behavior, there is no evidence that any of this behavior sparked complaints of harassment like those that [the employer] received concerning [the plaintiff such that the employer] cannot be faulted for failing to respond to these incidents in the same way that it responded to [the plaintiff's] situations) (citations and internal quotations omitted). Stated differently, although Brown was the subject of repeated complaints for being rude or hard on employees, there is no indication that she mis-instructed new hires about FCL's caregiving policy or otherwise engaged in behaviors that caused Kinzer to lose trust in her decision making abilities.

As such, FCL's arguments surrounding causation have not been squarely addressed, nor has plaintiff otherwise put forth evidence demonstrating the requisite causal link between her termination and disability. *See Justice v. Rockwell Collins, Inc.,* 117 F.Supp.3d 1119, 1134 (D. Or. 2015), *aff'd,* 720 Fed.Appx. 365 (9th Cir. 2017) ("if a party fails to counter an argument that the opposing party makes . . . the court may treat that argument as conceded") (citation and internal quotations and brackets omitted); *see also Whitley v. City of Portland*, 654 F.Supp.2d 1194, 1209 (D. Or. 2009) (self-assessments "are not sufficient evidence to satisfy [the third] element of a plaintiff's prima facie case"); *Redwind v. W. Union, LLC,* 2016 WL 3606595, *9 (D. Or. May 2), *adopted by* 2016 WL 3410183 (D. Or. June 16, 2016), *aff'd,* 698 Fed.Appx. 346 (9th Cir. 2017) (argument based on the opposing party's "own conjecture and speculation" was insufficient to

create a genuine issue of material fact); *Celotex*, 477 U.S. at 322 (summary judgment should be entered against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden on proof at trial").

Indeed, although plaintiff raises a number of theories and facts that allegedly create a disputed issue surrounding the third element,[11] the record makes clear that Brown had longstanding interpersonal issues with plaintiff that she reported to Kinzer; however, Kinzer did not act on those reports (beyond providing coaching to both parties) until plaintiff's performance began to negatively impact FCL's new hires. Plaintiff nonetheless maintains that these performance issues were falsely generated by Brown, yet she largely fails to contest the specific instances raised by Brown as inaccurate or otherwise attempt to clarify or expand upon those events in her own declaration. In any event, Kinzer and Sandoval separately agreed that plaintiff lacked knowledge and training on the clinical side, and that she repeatedly provided misinformation to caregivers and/or residents' families, which, at times, caused increased stress or complications. *See, e.g.*, Liss Decl. Ex. 5, at 22 (doc. 30-35). Although plaintiff attributes Kinzer and Sandoval's perceptions to their preexisting relationship with Brown, the fact remains that plaintiff also worked with Kinzer prior to FCL.

---

[11] Many of these arguments relate to her perceived performance and the reasons for her termination. Because plaintiff raises these issues as part of her prima facie case, the Court addresses them within that framework but nonetheless denotes that arguments touching upon an "employer's reasons for [the adverse employment action or] why employees are not similarly situated [are more appropriately considered] at the pretext stage of *McDonnell Douglas,* not the prima facie stage." *Hawn*, 615 F.3d at 1158-59.

Moreover, plaintiff identifies only one derogatory comment made about her disability –
i.e., Brown's July 22, 2020, email.[12] Copple Decl. Ex. 1, 27-28 (doc. 27). Even assuming this email
could reasonably be read in the manner advocated by plaintiff, it is undisputed that plaintiff "never
told [Kinzer] that she believed she was being discriminated against or harassed by others based on
her disability [or] complain that any [FCL] employee treated her differently because of her
disability." Kinzer Decl. ¶ 22 (doc. 26); Copple Decl. Ex. 1, at 34 (doc. 27); Liss Decl. Ex. 1, at
103 (doc. 30-1); *see also* Liss Decl. Ex. 2, at 10, 26 (doc. 30-2) (Kinzer testifying that the only
complaints plaintiff made about Brown was that she "was rude and [un]professional," such that
"[t]here was a constant kind of coaching with [plaintiff], especially in regards to [Brown] and just
how to handle their conflict"). And the record supports that Kinzer did not consult with Bault or
Brown regarding the decision to terminate plaintiff. *Id.* at ¶¶ 17-22; Kinzer Decl. Ex. N (doc. 26).
In other words, the uncontradicted evidence of record demonstrates the decision to terminate
plaintiff was singularly Kinzer's decision and that decision was based on information that was
independently corroborated by third parties. *Id.*; *see also Kannan*, 2022 WL 3973918 at *1 (under
a "cat's paw" theory,  a subordinate's criticism of the plaintiff does not support a discrimination
claim if there is no evidence that the subordinate is actually biased and/or influenced the challenged
employment action) (citing *Poland v. Chertoff*, 494 F.3d 1174, 1182 (9th Cir. 2007)).

Because plaintiff has not proven her prima facie case, the subsequent steps of the
*McDonnell Douglas* burden-shifting framework are not implicated. Nevertheless, even if plaintiff
had met her initial burden, it is undisputed that FCL has proffered legitimate, non-discriminatory

---

[12] While plaintiff does vaguely allude to approximately three "inappropriate" comments made by
Kinzer towards the end of the employment – i.e., that "others viewed her back condition [as]
preventing me from picking up shifts when staffing was an issue [such that I needed] to do more
for them" – the uncontravened evidence of record reflects that plaintiff was neither expected nor
asked to work regular caregiving shifts. Liss Decl. Ex. 1, at 36-38 (doc. 30-1).

reasons for its actions – i.e., Kinzer "lost trust in Peterson's judgment, communications, and decision making" after plaintiff  "mishandled a med tech's resignation," "three new hires quit citing Peterson's mistreatment," her "poor relationship with Brown caused a breakdown in communications about how to retain another employee," and she "gave incorrect caregiving directions to a new employee." Def.'s Mot. Summ. J. 18 (doc. 25); Pl.'s Resp. to Mot. Summ. J. 38 (doc. 29).

Plaintiff attacks these reasons, restating some of her arguments surrounding causation as well as positing additional facts purportedly suggestive of pretext. Pl.'s Resp. to Mot. Summ. J. 38 (doc. 29); *see also France*, 795 F.3d at 1175 (to establish pretext, the plaintiff can "directly [show] that unlawful discrimination more likely than not motivated the employer" or "indirectly [show] that the employer's proffered explanation is unworthy of credence because it is internally inconsistent or otherwise not believable"); *Hawn*, 615 F.3d at 1158 ("specific, substantial evidence of pretext [is required] to defeat employer's motion for summary judgment"). In particular, plaintiff argues:

> (1) she and Brown are comparators, and "Brown had been accused of similar conduct, including causing employees to quit, but was not even disciplined"; (2) FCL "disregard[ed] its own company policies" because she was not on a performance improvement plan at the time of her termination; (3) her performance issues "result[ed] from a disability"; and (4) "different reasons were provided for [her termination] by Kinzer and Bault," with Bault not even "know[ing] what policy was violated."

Pl.'s Resp. to Mot. Summ. J. 38-41 (doc. 29).

Concerning the first three proffered arguments, as set forth above, there is simply no evidence to support these contentions. *Cf. Batista v. Stewart Enters.*, 126 Fed.Appx. 767, 770 (9th Cir. 2005) (employer did not violate progressive discipline policy where that policy allowed "for termination without progressive discipline when an employee has engaged in 'willful

misconduct'"); *see also Lobato v. N.M. Env't Dep't*, 733 F.3d 1283, 1291 (10th Cir. 2013) (when "progressive discipline [is] entirely discretionary . . . the failure to implement progressive discipline is not evidence of pretext") (citations and internal quotations omitted). In fact, beyond citing to case law, plaintiff does not provide any argument or evidence relating to how her performance issues were one-in-the same as her disability. *See Anderson*, 477 U.S. at 252 (in order to defeat a motion for summary judgment "there must be evidence on which the jury could reasonably find for the [non-moving party]"); *see also Hernandez v. Spacelabs Med. Inc.*, 343 F.3d 1107, 1116 (9th Cir. 2003) ("conclusory allegations, unsupported by facts, are insufficient to survive a motion for summary judgment").

Plaintiff's fourth argument misconstrues the record. While pretext can be demonstrated by shifting or conflicting reasons for adverse treatment, the plaintiff must show that the employer's justifications are "fundamentally different [such that] they suggest the possibility that neither of the official reasons was the true reason." *Washington v. Garrett*, 10 F.3d 1421, 1434 (9th Cir. 1994). In this case, Kinzer documented the performance issues that led her to lose trust in plaintiff's management abilities, including that plaintiff advised a new hire to provide care that was inconsistent with FCL's policies, and Bault subsequently completed official paperwork on which she entered a code – i.e., "03" – that correspondingly reflected plaintiff was discharged for "fail[ure] to follow instructions/policy/contract." Kinzer Decl. Exs. N-O (doc. 26); Liss Decl. Ex. 47 (doc. 30-1).

Aside from the fact that there is nothing inherently inconsistent about these rationales, especially considering the record before the Court, the code Bault selected is the most accurate in light of the form's other available options. *See* Liss Decl. Ex. 47 (doc. 30-1) (remaining discharge codes options equate to: "not qualified," absenteeism/lateness," "drugs and alcohol," medical,"

"loss of license," "other," "not provided," and "dishonesty/theft, felony or misdemeanor, violation of law, criminal, illegal acts, property damage, fighting"); *see also Nidds,* 113 F.3d at 918 (no pretext argument is available where the termination reasons "are not incompatible"); *Johnson v. Nordstrom, Inc.,* 260 F.3d 727, 733-34 (7th Cir. 2001) (no inference of pretext exists if an employer "simply supplemented its explanation [where] there has been no retraction of any of its reasons" for the adverse action).

Lastly, the Court notes that, where, as here, "the same actor is responsible for both the hiring and the firing of a discrimination plaintiff, and both actions occur within a relatively short period of time, a strong inference arises that there was no discriminatory action." *Coghlan v. Am. Seafoods Co.,* 413 F.3d 1090, 1096 (9th Cir. 2005) (citation and internal quotations omitted); *see also Bradley v. Harcourt, Brace & Co.,* 104 F.3d 267, 270-71 (9th Cir. 1996) (employer's initial willingness to hire the discrimination plaintiff is strong evidence the employer is not biased against that protected class). As a result, summary judgment is inappropriate in "same actor" cases "only if a plaintiff can muster [an] extraordinarily strong showing of discrimination." *Coghlan,* 413 F.3d at 1097 (citation omitted). Such a showing is absent in the case at bar: the fact that Kinzer recruited and hired plaintiff for the AED role despite having prior knowledge of her back impairment and limitations strongly undermines any inference of discriminatory animus towards plaintiff based on her disability. FCL's motion is granted as to plaintiff's disability discrimination claim.

## II.    Whistleblower Retaliation Claim

To state a prima facie case pursuant to Or. Rev. Stat. § 659A.199, the plaintiff must demonstrate: (1) she engaged in a protected activity – i.e., reported conduct she in good faith believed to be illegal; (2) she suffered an adverse employment decision; and (3) there was a causal

link between the protected activity and the adverse employment decision. *Neighorn v. Quest Health Care*, 870 F.Supp.2d 1069, 1102 (D. Or. 2012).

Plaintiff's retaliation claim also fails at the prima facie level. Specifically, plaintiff furnished no evidence regarding the first element, outside of her broad declaratory statements that she "understood that I was reporting in good faith information that I believed was evidence of violations of state or federal law, rule, or regulation when . . . I reported": (1) "I was not trained on caregiving"; (2) "I was concerned about working as a caregiver because those tasks could cause me pain"; (3) "Brown was treating me poorly, harassing me, being rude to me, attacking me, and/or creating a hostile work environment"; and (4) Kirsten's statement "that Brown was creating a hostile work environment."[13] Peterson Decl. ¶¶ 3, 10 (doc. 31). However, it is well-established that "[a] conclusory, self-serving affidavit, lacking detailed facts and any supporting evidence, is insufficient to create a genuine issue of material fact." *F.T.C. v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1171 (9th Cir. 1997); *see also Bogner v. R & B Sys., Inc.*, 2011 WL 1832750, *3 (E.D. Wash. May 12, 2011) (court "is not bound by [a declarant's] legal conclusions"; disputed issues of material fact can "not [be] created by simply averring that an act 'was [a legal violation or]' declaring that one's versions of events is 'consistent' with one's theory of the case . . . declarations [must only be considered] for the facts contained therein").

---

[13] Plaintiff specifies in her declaration that she told Kinzer that working as a caregiver "could potentially cause me to become paralyzed." Peterson Decl. ¶ 3 (doc. 31). However, at her deposition, plaintiff expressly did not recall saying that to Kinzer, although she did state paralysis "is always a concern when I'm doing any usual repetitive movements." Liss Decl. Ex. 1, at 96 (doc. 30-1). At this stage in the proceedings, the Court "must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence" *Reeves v. Sanderson Plumbing Prods. Inc.*, 530 U.S. 133, 150 (2000) (citations omitted). The Court nonetheless defers to plaintiff's deposition testimony to the extent it provides a more detailed and contextualized account of the relevant events.

Accordingly, there is nothing in the record before the Court from which a trier of fact could reasonably conclude that plaintiff engaged in a protected activity. *Cf. Jamal v. Wilshire Mgmt. Leasing Corp.*, 320 F.Supp.2d 1060, 1078-79 (D. Or. 2004) (finding no protected activity where "illegal discrimination was [n]ever mentioned" during the plaintiff's conversations with the chief executive officer and human resources about her supervisor, she admitted during her deposition that "she did not mention age discrimination to [the chief executive officer]," and the factual record otherwise demonstrated that "all [the plaintiff] ever complained of was that she and anonymous other employees thought Magee was a bad manager"); *see also Learned v. City of Bellevue*, 860 F.2d 928, 932 (9th Cir. 1988) (finding no protected activity under Title VII where the plaintiff made complaints but "did not allege that he ever opposed any discrimination based upon race, color, religion, sex, or national origin," denoting "the underlying discrimination must be reasonably perceived as discrimination prohibited by [the invoked statute]"); *Lindblom v. Secretary of Army*, 2008 WL 640637, *2 (E.D. Cal. Mar. 5, 2008), *aff'd*, 366 Fed.Appx. 793 (9th Cir. 2010) (the plaintiff "must demonstrate a nexus between the alleged harassment and [her protected status]; merely citing instances of unpleasant treatment is not sufficient") (citation and internal quotations omitted).

Indeed, the remarks on which plaintiff relies were not focused on perceived discrimination, but rather on her physical limitations and knowledge gaps as a care giver, and rude co-worker behavior. Moreover, plaintiff endorsed one workplace limitation associated with her disability (i.e., the inability to lift residents or other heavy loads), and the record unambiguously reflects that: (1) she was only asked to act as a caregiver on two occasions in order to meet state staffing requirements; (2) she was never given assignments in her role as caregiver that required her to work in excess of her restrictions; and (3) when "she asked for accommodations not to do certain

physical things" or "to leave for appointments [or] if her back was acting up," those were approved. Liss Decl. Ex. 2, at 54-55, 59 (doc. 30-2).

Finally, to the extent her retaliation claim is premised on her communications with Bault, Kinzer made the termination decision and otherwise was not aware that plaintiff "exchanged voicemails with Ms. Bault in August 2020 about a harassment concern" prior to this litigation. Kinzer Decl. ¶¶ 18, 23 (doc. 26). In any event, Bault testified that she never received any information from plaintiff or anyone else at FCL that plaintiff had a disability or restrictions of her physical work duties. Liss Decl. Ex. 35, at 16-17 (doc. 30-35).

Even presuming, however, that plaintiff met her prima facie case requirements, as discussed above, FCL had a legitimate, non-discriminatory reason for her termination. In response, plaintiff failed to produce any additional evidence of pretext in relation to her retaliation claim. And, based on the lack of pretext evidence surrounding her discrimination claim, no reasonable jury could conclude that the alleged reason for plaintiff's discharge was false, or that the true reason for plaintiff's discharge was a discriminatory or retaliatory reason. In fact, "a plaintiff may not rely on the proximity in time between the protected activity and the adverse employment action to create a triable issue of fact after the employer has offered legitimate reasons for its actions." *Justice*, 117 F.Supp.3d at 1141 (citation and internal quotations omitted).  FCL's motion is granted as to plaintiff's retaliation claim.

##

##

##

##

##

**CONCLUSION**

For the foregoing reasons, FCL's Motion for Summary Judgment (doc. 25) is granted and this case is dismissed. Plaintiff's request for oral argument is denied as unnecessary.

IT IS SO ORDERED.

DATED this 2nd day of June, 2023.


_____/s/ Jolie A. Russo_____
Jolie A. Russo
United States Magistrate Judge